[No. S045184. June 18, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN WAYNE BONILLA, Defendant and Appellant.

**COUNSEL**

David A. Nickerson, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—A jury convicted defendant Steven Wayne Bonilla of first degree murder with murder-for-financial-gain and lying-in-wait special circumstances for the 1987 killing of Jerry Lee Harris. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(1), 190.2, former subd. (a)(15).)[1] Bonilla's first penalty phase trial ended in a hung jury; at his second penalty phase trial, the jury returned a death verdict. On automatic appeal, we affirm the judgment in its entirety.

---

[1] All further unlabeled statutory references are to the Penal Code.

## Factual and Procedural Background

*Guilt Phase Trial*

*Prosecution Evidence*

Jerry Lee Harris was a San Francisco Bay Area entrepreneur. Harris and Bonilla were longtime friends, and Bonilla occasionally assisted Harris with his business ventures. In particular, Bonilla invested in a Harris plant nursery and rental business, Tiffany's, and in a Harris rebar fabricating business, and managed a Harris lounge, the Penthouse.

In 1986, Harris decided to open a Cupertino nightclub called Baritz. As he had on some previous occasions, he borrowed $232,000 in seed money from Bonilla's mother. Bonilla supposedly could not formally become a partner in Baritz until 1989 because of Department of Alcoholic Beverage Control regulations, but in March 1987, Harris and Bonilla nevertheless signed an agreement giving Bonilla an interim 40 percent stake in Baritz.

Baritz was quickly successful, and Bonilla began receiving $5,000 monthly checks from its operating profits. However, Bonilla and Harris had a series of disagreements over how much say Bonilla would have in Baritz's operations, as well as those of other Harris-owned restaurants and clubs. Harris directed Don Baptist, Baritz's landlord, who had access to its books because of the nature of the lease agreement, to prevent Bonilla from accessing those books; Bonilla complained to Baptist that he was being treated unfairly and sought access to Baritz's financial information to determine whether Harris was living up to their partnership agreement. Harris and Bonilla argued again in August or September 1987 when Bonilla agreed to loan Harris $8,000, but the check he provided bounced. In September and October 1987, Bonilla received no payments from Baritz.

The prosecution presented details of what followed principally through the testimony of Bradley George Keyes. In October 1987, Bonilla got in touch with Keyes, an old Nevada acquaintance; explained that he had "something going" with their mutual acquaintance, William Nichols; and arranged to meet with Keyes in Elko, Nevada. There, he explained to Keyes that he had a business partner who was treating him unfairly, but he could not take legal action because the partner had doctored the books. Bonilla claimed the partner owed him more than $1 million on a plant deal and was hiding nightclub profits he owed Bonilla. Bonilla said the partner deserved to die and if he did, Bonilla would be able to take over the partner's businesses and skim tax-free money. As a result, "everybody would be rich."

Keyes then flew to the San Francisco Bay Area and met with Nichols. Nichols explained that Bonilla's business partner, Harris, was cheating

Bonilla, and Bonilla and Nichols were working on a way to kill Harris. Over the next few days, Nichols and Keyes scouted Harris's businesses and discussed ways to kill him and dispose of the body. They failed to develop a concrete plan, and Bonilla paid to fly Keyes back to Nevada, while Nichols returned home to Phoenix, Arizona. Bonilla told Keyes to return when they had a plan worked out.

Days later, on or about October 12, Bonilla or Nichols wired Keyes money to return to the Bay Area and the three met again. Bonilla explained he was running out of money, so Harris needed to be killed soon. Once Harris was dead, Bonilla would be able to push Harris's wife, Susan, aside, take over Harris's businesses, and start skimming money. Bonilla believed that because Harris had cheated many people, there would be many suspects if Harris died. Keyes and Nichols spent more days trying to plan how to kill Harris, while Bonilla grew increasingly impatient. One evening, Bonilla had dinner with Harris and his wife, while Nichols and Keyes waited outside, but they decided not to grab Harris yet because there were too many potential witnesses. With no plan in place, Keyes again returned to Nevada and Nichols to Arizona, while Bonilla tried to figure out how to lure Harris to a more secluded place so Keyes and Nichols could kill him.

On October 19, Keyes and Nichols returned for a third time and met with Bonilla. The next day, Nichols explained the plan to Keyes: Bonilla would bring Harris to a vacant office park in Pleasanton, purportedly to meet with a real estate agent to see some commercial space for one of Harris's businesses. Nichols would pose as the agent, Keyes as a security guard. They would jump Harris, duct tape and handcuff him, put him in Bonilla's pickup truck, plant Harris's car at an airport in Sacramento to make it appear he had flown off, and dispose of Harris's body.

Consistent with this plan, Bonilla arranged with Harris to have drinks and then show him the office space. When they arrived at the deserted office park parking lot after 8:30 p.m., Nichols and Keyes were there waiting. Keyes, playing the part of a security guard, wrote down a few license plate numbers, then joined Nichols, Bonilla, and Harris. Nichols suddenly sprayed Harris with Mace, and Keyes grabbed Harris and fell to the ground with him. Bonilla walked off to move the rental car Nichols had arrived in. Nichols and Keyes carried the struggling Harris to Bonilla's pickup truck and threw him in the back, then Nichols covered Harris's head in duct tape. Bonilla returned, helped Keyes start Harris's car, and told Keyes as Keyes pulled out to follow Nichols, who was driving the pickup truck: "See you later, and be careful."

Nichols and Keyes left Harris's car in a Sacramento airport parking lot, determined Harris had suffocated, and finally settled on a remote Nevada

location to dispose of his body. They removed his ring and the duct tape, dug a shallow grave, and buried him.

The next morning, Susan Harris, concerned about her husband's absence, called Bonilla to ask if he had seen him. Bonilla replied, "No, why?" After Susan pointed out that Bonilla had been with her husband the night before and then at an office park, Bonilla replied, "Yes, at [the bar], why?" and "Yeah, in Pleasanton, why?" He denied any knowledge of where Harris had gone after the office park visit; they had gone their separate ways. When Harris's brother Sandy asked Bonilla about Harris's whereabouts later that day, Bonilla indicated Harris had taken off to a meeting after they met for drinks.

Within a week of Harris's disappearance, Bonilla showed up at Baritz to examine the financial records. However, he was unable to seize immediate control of Harris's businesses; instead, he and Susan Harris plunged into litigation.

In January 1988, a rock hunter found Harris's body. In February 1988, Harris's car was found at the Sacramento airport. Authorities followed leads that eventually led them to Keyes, who, after offering several shifting alibis, made a deal with prosecutors that he would testify against Nichols and Bonilla and receive a sentence no greater than three years in state prison. Over a period of five months, Keyes cooperated by placing taped phone calls to Nichols and Bonilla to obtain incriminating statements. Thereafter, Nichols and Bonilla were arrested and tried jointly.

### Defense Evidence

The defense focused on differences between Keyes's trial testimony and earlier statements he had made to the police and others. In addition, Bonilla testified in his own defense and offered a slightly different version of events.

During initial statements to the Nevada police in March 1988, Keyes said he met with Harris to intimidate him into signing over his businesses to Bonilla. He denied knowing of any plan to murder Harris. He claimed to have left the office park parking lot with Harris still alive. Keyes did not learn Harris was dead until they got to Nevada, at which point Nichols explained things had gotten out of hand. Keyes made similar statements to a bail bondsman friend near the time of his arrest.

In April 1988, Keyes spoke with a church minister and again minimized his role. He said he had helped rough up a guy who owed someone some money, then went and sat in a car while two others continued to rough him

up. They got carried away and killed him. When the minister told him he did not believe him, Keyes changed his story and said he was involved in the whole process, that they had put duct tape on the man's mouth, and he had died as a result. Months later, Keyes reiterated to the minister that the killing had been unintentional. Keyes made similar statements to an elder and a Bible study teacher at his church: he was an enforcer and during the collection of funds someone had accidentally died.

Bonilla testified in his own defense. He said he ran Sunstate Tropicals, a shell company that facilitated Tiffany's, Harris's plant business, by loaning Tiffany's money. Tiffany's had repaid only some of the money and owed Sunstate Tropicals approximately $1.2 million when Harris died. Bonilla provided $50,000 of his mother's money to acquire a stake in Harris's rebar business, but Harris instead treated the money as a loan and never repaid it.

Bonilla and Harris were partners in Baritz. Bonilla borrowed $232,000 from his mother to acquire a 40 percent stake. He received monthly $5,000 interim payments until they could determine what Baritz's actual profits were. In addition, Bonilla was to receive promissory notes reflecting the sums he had advanced. In the summer of 1987, Bonilla discovered more than $100,000 was missing from Baritz's accounts. Harris at first admitted money was missing, then later denied any was.

At the same time, Nichols, an old acquaintance, proposed that he and Bonilla start a tile business; Nichols would run the business, while Bonilla would provide startup capital. At the time, Bonilla had no money on hand to fund the business. He told Nichols he could not invest because another business partner was misappropriating funds. Nichols was upset and volunteered to talk directly with the partner. Nichols also suggested Bonilla contact Keyes about joining the tile business. Bonilla did so and explained nothing could happen until the problem of the missing Harris funds was resolved. Keyes agreed to go to California to talk with Nichols.

The first time Keyes and Nichols came to California, Bonilla spoke only with Nichols, discussing ways to talk to Harris about the missing money.

The second time Nichols and Keyes came to California, the idea was that they would talk to Harris and point out money was missing from Baritz. There was no plan to harm Harris. Nichols and Keyes had a chance to confront Harris after a dinner Bonilla had with Harris and his wife Susan, but elected not to because Nichols did not want to talk to Harris in front of his wife.

Bonilla had found office space in Pleasanton he wanted to show Harris for one of Harris's businesses. This coincided with Nichols and Keyes being in

town for the third time, so Bonilla mentioned to Nichols that he was going to show Harris a particular office complex. Bonilla expected Nichols and Keyes to be there, but there was no plan to rough up or intimidate Harris, and Bonilla never discussed what Keyes's role might be. He did expect, however, that an agreement regarding the missing money would be reached that night.

Concealing the true reason for the visit, Bonilla brought Harris to the office park. Nichols and Keyes were there when Harris and Bonilla arrived. Bonilla saw Keyes writing something on a pad, asked Nichols what Keyes was doing, heard a commotion, and turned to see Keyes spraying something in Harris's face. Keyes and Harris began fighting, and Bonilla, afraid, got in his car and drove home. He did not think Harris was dead.

That night, Nichols called and said there had been an accident and to come pick up the rental car they had left at the office park. He heard Keyes in the background warning Bonilla not to mention anyone's name. A day or two later, Nichols called and indicated Harris was dead. Thereafter, Bonilla lied to the FBI, the police, and Susan and Sandy Harris because he was afraid of Keyes.

Defense counsel argued that Keyes's statements and Bonilla's testimony established Bonilla had no plan to kill Harris and that he was used by Nichols, who had a greater incentive to see Harris dead.

### Penalty Phase Trial

As noted, Bonilla's first penalty phase trial ended in a hung jury and a mistrial. At the second penalty phase trial, before a new jury, the prosecution relied in part on the circumstances of the crime, and thus the prosecution and defense reintroduced much of the same evidence presented at the guilt phase. The evidence recounted here relates solely to the new evidence introduced during the second penalty phase trial.

### Prosecution Evidence

Aside from the circumstances of the crime, the prosecution's penalty case centered on evidence of numerous other Bonilla-led conspiracies to kill those who had crossed him.

Bonilla bought a catering supplies business from Mel Carrera in 1978. Shortly after closing the deal, he and Carrera began arguing over the amount of the business's debt Bonilla was to assume. Weeks later, Bonilla showed up at the business; 30 minutes after he left, it burned to the ground. Bonilla's

wife Pat and the business's general manager, Lou Sans, were working in the front; they escaped with their lives, but the business was a loss.

One month later, Bonilla and his wife separated. Bonilla began seeing another woman, Mariana Weavers, and admitted to her he had wanted the fire set for the insurance money. Pat began seeing Lou Sans. Bonilla expressed anger toward Pat and Sans and told Weavers he would "kill anybody who got in his way."

After Bonilla and Pat divorced, Bonilla married Weavers and Pat married Sans. Bonilla beat Weavers and on one occasion threw her down, placed a gun in her mouth, and accused her of sleeping with another man.

In 1978 or 1979, Keyes met Nichols. At Nichols's request, Keyes came to the Bay Area, where he met Bonilla. Keyes was then taken to Auburn and introduced to a friend of Nichols's, a man named Willie. Keyes learned Bonilla had hired Willie to track down and kill a man who was with Bonilla's ex-wife and who worked at a Sacramento newspaper, and he understood he was to help him. Pat and Sans had moved to Auburn with Pat and Bonilla's daughters, and Sans now worked for the Sacramento Bee. Willie and Keyes did not follow through. When Willie asked Bonilla for more money, Bonilla came, met with Willie and Keyes, told them there had been a change of plan, and drove them to Mel Carrera's house in Nevada. He told them he wanted Carrera dead instead, gave them money, and left. Again, Willie and Keyes did not follow through.

Nichols later contacted Keyes and asked him to return to Auburn to kill Lou and Pat Sans. Nichols had a car bomb and said Bonilla would show Keyes where the targets lived and wanted him to put it on their car. Keyes came to Bonilla's house in Cupertino, where Bonilla explained he would pick up his and Pat's daughters from the Sanses', drop them off with relatives, then go to a party to establish an alibi while Keyes attached the bomb to the Sanses' car. Bonilla provided a description of the car, a map, and instructions on how to access the Sanses' gated community. According to Weavers, Bonilla wanted the Sanses dead in part because he resented Pat Sans's ongoing control over Bonilla's money. This time, Keyes planted the bomb, but rigged it not to explode.

After Bonilla's 1992 conviction, he was placed in a cell adjacent to Shelton McDaniels. He spoke with McDaniels about his case. He said he had paid someone to kill Keyes, but "the guy just took off with his money," so he had no money to kill Keyes. Because his money was tied up in lawsuits with Susan Harris, he wanted to terrorize her or kill her so he could get the money to kill Keyes and prevent him from testifying at the penalty phase retrial.

McDaniels put Bonilla in touch with Michael Cooperwood, an incarcerated colonel in the Black Guerrilla Family prison gang, who agreed to kill Susan Harris for $35,000. Once Harris was dead and Bonilla's money was freed up, Bonilla would pay another $50,000 to have Keyes killed.

Bonilla had his mother pay an initial $10,000. Part of the money was used to bail out Weldon Wiggins, who tracked down Susan Harris and contacted her but did not immediately kidnap or kill her. Harris, frightened by this encounter and a subsequent threatening letter, went into hiding. No further efforts were made to kill Susan Harris because Bonilla could not come up with any additional money.

The other principal focus of the penalty phase case was victim impact testimony from Susan Harris, Jerry Harris's daughter Tiffany, and friends talking about Jerry Harris's charitable acts.

### Defense Evidence

Bonilla called three family members: his daughter Jennifer, his cousin Linda Chapman, and his sister Kathy. They wanted Bonilla's life spared and described the Bonilla family as close. As Jennifer put it, "[I]f he dies, then part of us dies, and then we have nightmares to live with for the rest of our lives." Bonilla also called an Alameda County District Attorney's Office inspector who had had numerous conversations with Keyes during the 1988 investigation. The inspector did not think Keyes had been initially truthful during their conversations about the crime.

### Codefendant Nichols's Evidence

Nichols took the stand for the first time during his penalty phase defense. He described himself as a "collector" who settled money disputes between criminals through intimidation or force. He never killed anyone. He took money from Bonilla to kill Lou Sans, but he never intended to do so. He also took money from Bonilla to kill Jerry Harris, but again he had no intention of actually killing Harris. Harris's death was an accident; Nichols heard Harris banging in the back of the truck on the way to Sacramento and was surprised to find him dead when they arrived there. He expressed remorse for Harris's death.

### Procedural History

Bonilla and Nichols were each charged with first degree murder with two special circumstances, murder for financial gain and murder while lying in wait. They were tried jointly. In April 1992, a jury convicted each defendant

of first degree murder and found both special circumstances true. The jury was unable to reach a verdict on penalty for either defendant.

Bonilla and Nichols were retried before a new penalty phase jury in 1994. This time, the jury returned a verdict of death against Bonilla, but again could not reach a verdict for Nichols. The prosecution abandoned further attempts to seek the death penalty against Nichols, who was sentenced to life in prison without possibility of parole.

DISCUSSION

## I. Guilt Phase Claims

### A. Flight Instruction (CALJIC No. 2.52)

▉ The trial court instructed the jury with the standard instruction covering use of a defendant's flight as evidence of guilt. (See § 1127c [requiring instruction where prosecution relies on flight as evidence of guilt].)[2] Bonilla argues this was error because there was no substantial evidence he fled; at most, the evidence showed only that codefendant Nichols, who drove to Sacramento and then Nevada immediately after the murder, did so.

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544], quoting *People v. Ray* (1996) 13 Cal.4th 313, 345 [52 Cal.Rptr.2d 296, 914 P.2d 846]; see also *People v. Pensinger* (1991) 52 Cal.3d 1210, 1245 [278 Cal.Rptr. 640, 805 P.2d 899].) Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest "a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869 [251 Cal.Rptr. 227, 760 P.2d 423]; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 126 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *Bradford*, at p. 1055.) To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. (See *People v. Turner* (1990) 50 Cal.3d 668, 694–695 [268 Cal.Rptr. 706, 789 P.2d 887].)

---

[2] The instruction provided: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (CALJIC No. 2.52.)

The evidence supported such findings and inferences here. There is no dispute Bonilla immediately left the scene. Moreover, he did so under circumstances that could have given rise to an inference of consciousness of guilt: when Harris was attacked, Bonilla, by his own admission, did not call out to him, attempt to aid him, or call for or go for assistance (acts that might have led to Bonilla's detection at the scene or otherwise connected him with the attack). The jury could attribute an innocent explanation to his conduct, but it could also infer that his departure and the circumstances thereof were consistent with and supported the prosecution's theory—that Bonilla planned and intended the attack on Harris—and were inconsistent with Bonilla's theory—that the attack was a complete surprise about which he had no prior guilty knowledge. (See *People v. Jurado, supra,* 38 Cal.4th at p. 126 [failure to use call box to summon assistance at crime scene before leaving supported flight instruction].) Consequently, it was not error to give a flight instruction.

### B. *Consciousness of Guilt Instruction (CALJIC No. 2.03)*

The prosecution argued Bonilla's October 1987 statements to Susan and to Sandy Harris, denying knowledge of Jerry Harris's whereabouts, reflected a consciousness of guilt: if Bonilla truly was innocent, why did he not tell Susan or Sandy Harris that he had seen Jerry Harris being assaulted by Nichols and Keyes? The jury was then instructed with a consciousness of guilt instruction.[3] Bonilla argues this instruction is impermissibly argumentative; consequently, defense counsel alone, rather than the trial court, should have been permitted to decide whether the instruction would be given; and the giving of the instruction violated his rights to due process, a jury trial before a properly instructed jury, and a fair and reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.)[4]

As Bonilla acknowledges, we have repeatedly rejected this argument. (E.g., *People v. Jurado, supra,* 38 Cal.4th at pp. 125–126; *People v. Benavides, supra,* 35 Cal.4th at p. 100; *People v. Kipp* (1998) 18 Cal.4th 349, 375 [75

---

[3] The instruction provided: "If you find that before this trial a defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (CALJIC No. 2.03.)

[4] The People contend this argument and various of Bonilla's other challenges to the jury instructions (CALJIC Nos. 2.01 and 8.81.15, *post,* at pts. II.B. and I.C.2.) are forfeited because Bonilla failed to object at trial. However, section 1259 permits appellate review to the extent any erroneous instruction "affected [Bonilla's] substantial rights"; thus, to the extent any claims of instructional error are meritorious and contributed to Bonilla's conviction and death sentence, they are reviewable. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; see *People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) We thus may assess each claim on its merits.

Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Bonilla nevertheless asks us to reconsider these decisions in light of *People v. Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388], which he contends rejected as argumentative an instruction materially identical to CALJIC No. 2.03. Bonilla is correct that the rejected instruction in *Mincey* was *structurally* identical to CALJIC No. 2.03: both contained the propositional structure "If [certain facts] are shown, then you may [draw particular conclusions]." But it was not the structure that was problematic in *Mincey*. Rather, it was the way the proposed instruction articulated the predicate "certain facts": " 'If you find that the beatings were *a misguided, irrational and totally unjustified attempt at discipline rather than torture* as defined above, you may . . . .' " (*Mincey*, at p. 437, fn. 5, italics added.) This argumentative language focused the jury on the defendant's version of the facts, not his legal theory of the case; this flaw, not the generic "if/then" structure, is what caused us to approve the trial court's rejection of the instruction. (*Id.* at p. 437.) Any parallels between that instruction and CALJIC No. 2.03 are thus immaterial. (*People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) We adhere to our prior decisions rejecting the argument that CALJIC No. 2.03 is impermissibly argumentative.

### C. *Lying-in-wait Special Circumstance*

The jury found true the special circumstance that "[t]he defendant intentionally killed the victim while lying in wait." (§ 190.2, former subd. (a)(15), added by Prop. 7, § 6, as approved by voters, Gen. Elec. (Nov. 7, 1978).) Bonilla challenges the sufficiency of the evidence supporting this special circumstance, the adequacy of the instructions on it, and its constitutionality. We reject each set of contentions in turn.

#### 1. *Sufficiency of the evidence*

■ The lying-in-wait special circumstance requires proof of " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." ' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 500 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Bonilla contends the evidence at trial was insufficient in three regards: it failed to show (1) he personally killed Harris; (2) there was a substantial period of watching and waiting; and (3) the killing occurred during or immediately after the period of watching and waiting.

■ The first argument rests on a misapprehension of the law. While it is true the prosecution failed to adduce any evidence that Bonilla, as opposed to

coconspirators Nichols and Keyes, personally killed Harris, it was not required to do so. At the time of Harris's murder, section 190.2, former subdivision (b) extended death eligibility to those who aid and abet a lying-in-wait special-circumstance murder: "Every person *whether or not the actual killer* found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraph[] . . . (15) [the lying-in-wait special circumstance] . . . of subdivision (a) of this section has been charged and specially found . . . true." (§ 190.2, former subd. (b), added by Prop. 7, § 6, as approved by voters, Gen. Elec. (Nov. 7, 1978), italics added.)[5]

Bonilla argues that even so, the lying-in-wait special circumstance specifically requires that "the defendant" kill the victim (§ 190.2, former subd. (a)(15)); thus, it can be found true for a given defendant only when he is the actual killer; and therefore, the liability-expanding provisions of section 190.2, former subdivision (b), which require a special circumstance to be found true, can never apply. This interpretation would render the express inclusion of lying in wait among the special circumstances covered by former subdivision (b) a nullity. We decline to attach special significance to the choice of the words "the defendant," as opposed to "the killer" or "the murderer," where to do so would negate in whole or in part another statutory provision. Had murder by lying in wait been intended to be omitted from the list of special circumstances that could extend to aiders and abettors, former subdivision (a)(15) would have been excluded from the list in former subdivision (b), just as the prior-murder-conviction special circumstance (§ 190.2, subd. (a)(2)) was.

Bonilla's second and third arguments build on this same misapprehension of the law. Bonilla argues that *he* did not engage in a substantial period of watchful waiting and that Harris was not killed during or immediately after any period in which *Bonilla* was concealing his purpose and watchfully waiting. But the issue is not whether Bonilla killed Harris while lying in wait; rather, the issue is whether Bonilla aided and abetted Harris's killing, and whether the actual killers killed Harris while (or immediately after) lying in wait. Bonilla does not suggest there was insufficient evidence he aided and abetted Harris's death, and he expressly concedes that based on the evidence at trial one can "make[] a plausible case that Nichols and Keyes killed Harris while lying-in-wait." Given this concession—one overwhelmingly supported

---

[5] The same principle is carried forward today in section 190.2, subdivision (c).

by the evidence at trial[6]—his claims fail. The jury could conclude that Bonilla aided and abetted Harris's killing, with the intent that Harris die, and thus that he too was guilty of the lying-in-wait special circumstance.

### 2. *Constitutionality of the lying-in-wait jury instruction (CALJIC No. 8.81.15)*

The jury was instructed with a modified version of the standard CALJIC No. 8.81.15 instruction regarding the elements of the lying-in-wait special circumstance. Bonilla contends this instruction violated his due process and Eighth Amendment rights because (1) it failed to require that the jury find he personally lay in wait and killed Harris, and could have been satisfied solely by a finding that Nichols did so; (2) it provided contradictory and confusing descriptions of the time elements associated with the special circumstance; and (3) it provided contradictory and confusing descriptions of the concealment elements associated with the special circumstance.

All three claims fail. The instruction did not require that Bonilla personally kill Harris or that he personally lie in wait for Harris, but this was correct as a matter of law: as discussed above, the special circumstances in section 190.2 apply equally to those who are liable for first degree murder only as an aider and abettor, provided they have the intent to kill. (§ 190.2, former subd. (b); see *People v. Anderson* (1987) 43 Cal.3d 1104, 1142 [240 Cal.Rptr. 585, 742 P.2d 1306].) Thus, the jury properly could find the special circumstance true based on evidence that Bonilla, with the intent to kill, aided and abetted Nichols, who lay in wait for and murdered Harris.

Nor was the instruction contradictory as to the time element required. Bonilla objects that the instruction defined that element in materially different ways, on the one hand indicating that lying in wait "need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation" where another instruction indicated premeditation could be accomplished in a "short period of time," and on the other requiring proof of "a substantial period of watching and waiting." We previously have concluded an instruction that conveys both that a defendant must lie in wait at least long enough to premeditate and deliberate and that he must do so for a not insubstantial period of time is not unconstitutionally imprecise. (See *People v. Stevens* (2007) 41 Cal.4th 182, 203–204; *People v. Edwards* (1991) 54 Cal.3d 787, 823, 845 [1 Cal.Rptr.2d

---

[6] The evidence presented permitted the jury to conclude this case was a classic lying-in-wait special-circumstance murder. Bonilla took Harris to a near-deserted location at night, where Bonilla's coconspirators, Nichols and Keyes, waited to ambush Harris. Nichols and Keyes posed as a real estate agent and a security guard, waited for an opportune moment to catch Harris unawares, then attacked and killed him.

696, 819 P.2d 436].) Such an instruction accurately reflects the elements of the special circumstance as defined in *People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]. As we have interpreted it in *Morales* and subsequent cases, the lying-in-wait special circumstance requires no fixed, quantitative minimum time, but the lying in wait must continue for long enough to premeditate and deliberate, conceal one's purpose, and wait and watch for an opportune moment to attack. (See, e.g., *People v. Sims* (1993) 5 Cal.4th 405, 433–434 [20 Cal.Rptr.2d 537, 853 P.2d 992].) The instruction correctly conveyed this.

■ Finally, the instruction was not contradictory or confusing in its explanation of the concealment required. The instruction required "concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence," but clarified that concealment of purpose alone was not enough; there must also be "a substantial period of watching and waiting for an opportune time to act" and "immediately thereafter, a surprise attack . . . from a position of advantage." Again, these statements are consistent: a person may satisfy the requirement by concealing both his purpose and presence, or only his purpose, not his presence, so long as he also watches and waits for a substantial period and then launches a surprise attack from a position of advantage. (See *People v. Stevens, supra,* 41 Cal.4th at pp. 203–204.)

### 3. *Constitutionality of the lying-in-wait special circumstance*

Finally, Bonilla challenges the lying-in-wait special circumstance as unconstitutional under the Eighth Amendment to the United States Constitution because it fails to meaningfully narrow the pool of death-eligible crimes and select out crimes that are genuinely deserving of a greater sentence, extending, rather, to virtually all lying-in-wait first degree murders. He acknowledges that we have previously rejected this argument (see, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148–1149 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *People v. Sims, supra,* 5 Cal.4th at p. 434), but argues those decisions are no longer applicable because Proposition 18 (as approved by voters, Primary Elec. (Mar. 7, 2000)) amended the lying-in-wait special circumstance so that its language now more closely follows the language used to define lying-in-wait first degree murder. (See § 190.2, subd. (a)(15), Stats. 1998, ch. 629, § 2.)

Bonilla was independently death eligible under the murder-for-financial-gain special circumstance. (§ 190.2, subd. (a)(1).) He does not challenge that circumstance's constitutionality. Consequently, we need not consider Bonilla's argument that the lying-in-wait special circumstance fails to adequately narrow

the pool of death-eligible crimes, as in this case the circumstance was superfluous for purposes of death eligibility and did not alter the universe of facts and circumstances to which the jury could accord aggravating weight. (See *Brown v. Sanders* (2006) 546 U.S. 212, 222–223 [163 L.Ed.2d 723, 126 S.Ct. 884].) In addition, Harris was killed before Proposition 18 took effect, and Bonilla's jury was instructed based on the language of section 190.2, former subdivision (a)(15). Consequently, we need not consider the impact of Proposition 18 and express no opinion on its constitutionality.

## II. *Joint Guilt and Penalty Phase Claims*

### A. *Prosecutorial Misconduct: Vouching for Witness Credibility*

During opening and closing argument at both the guilt and penalty phases, the prosecutor referred to the terms of star witness Bradley Keyes's plea agreement, an agreement that required Keyes to testify truthfully. Bonilla now argues these references constituted impermissible vouching, in violation of his rights to due process and a fair and reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We conclude (1) Bonilla's claims are partially waived, and (2) they in any event fail on the merits because the prosecutor's arguments were no more than permissible comment about inferences the jury could draw from evidence in the record.

During his guilt phase opening argument, the prosecutor read the terms of Keyes's plea agreement to the jury. The agreement repeatedly provided it was contingent on Keyes's truthfulness.[7]

During guilt phase closing argument, the prosecutor returned to the subject of Keyes's plea agreement and the circumstances under which it was entered.

---

[7] As read to the jury, the agreement provided in relevant part: "*Bradley George Keyes agrees to tell the absolute truth* about his involvement with the death of Jerry Harris;

"That Bradley George Keyes agrees to cooperate fully with law enforcement authorities in the continuing investigation of the death of Jerry Lee Harris;

"*Bradley George Keyes agrees to testify in a court of law under oath fully and truthfully* about the events of the death of Jerry Lee Harris;

"That *if . . . Bradley George Keyes testifies truthfully under oath in a court of law* about the events surrounding the death of Jerry Lee Harris, he will be allowed to plead guilty to a charge of conspiracy to commit murder . . . and to a charge of . . . accessory to murder.

"It is further understood between the parties that, *if Bradley George Keyes is not truthful* about his involvement in the death of Jerry Lee Harris or does not testify truthfully about his involvement or the involvement of others in the death of Jerry Lee Harris, *this agreement is rescinded and is null and void.*

"It is understood that Bradley George Keyes will plead guilty to the above-mentioned charges and will be sentenced to a maximum of up to three years in state prison. . . .

"*Bradley George Keyes understands that this agreement is contingent upon his being truthful and that, if he does not at any time tell the truth from this date forward . . . this agreement is rescinded and is null and void.*" (Italics added.)

The prosecution had a bird in the hand, Keyes; it had to choose between prosecuting Keyes and letting two birds in the bush, Nichols and Bonilla, off the hook for lack of evidence or "making a deal with the devil. But at least you are attempting to bring to justice the persons that are involved in the case, all of them. [¶] . . . [¶] He is lucky. Brad Keyes is lucky. He ought to be sitting here with these two. He ought to be facing the same charges, but he is not. *But the agreement says he has got to testify truthfully, otherwise there is no deal.* That is the trade-off." (Italics added.)

The prosecutor later recounted Keyes's initial shifting stories and false statements, then addressed his preliminary hearing testimony: "And then when he gets to the preliminary hearing . . . . [h]e talks. He is consistent with regard to three trips and things that are going on, but what he does reveal now is what really was said during all of those meetings and trips. And they got to cross-examine him about that. And what it really amounted to from his [perspective] is *he has got to testify under oath, otherwise his deal doesn't work. It has got to be truthful.* [¶] You know, when he testified in front of Judge Margulies and still at that point still denied, knowing about the plot, but when he gets to the preliminary hearing where now it is crunch time and *he resolves in his own mind that he has got to tell the truth, the full truth, he goes that extra step and talks about things that were said.*" (Italics added.) And later: "Once we get into the court and Brad Keyes testifies and they cross-examine the hell out of him, and *his story holds up under cross-examination because he was telling the truth about what happened,* then we get a shift." (Italics added.) The prosecutor closed his summation by pointing again to Keyes's testimony: "There's two theories you can reach for. You can reach first degree murder under a lying in wait or premeditated theory. And they both apply because they are both there. [¶] And it is clearly, based on what you hear in these tapes and based upon what Brad Keyes said, it is a murder for hire, murder for financial gain."

During penalty phase opening argument, the prosecutor again read the terms of Keyes's agreement to the jury, including the fact the prosecutor had personally signed it.[8] Finally, during his closing argument, the prosecutor addressed Keyes's credibility: "You know, Keyes lied about his intent [to others outside the courtroom]. There is no question about that, and you heard him testify about that, but [defense counsel] want you to believe . . . that Brad Keyes was spoon-fed all this information so that we could elevate this case beyond what it was. [¶] Well, that is ludicrous, because one of the things they talk about is this issue of cross-examination. You saw the stacks of transcripts from the preliminary hearing, the first trial, and an equal size stack now with respect to all the questions that were asked of Brad Keyes. And we know from everything we have heard in this case there were three trips down

---

[8] The plea agreement was admitted into evidence.

there, as he says. [¶] You know [from] everything we have heard in this case that they went to various different motels, and he was able to remember which ones they went to. You know that there were motel receipts showing where they stayed. We know there were rental cars used, all the records show that. [¶] The thing he was not filling in were some of the conversations, and he explained to you why. But you got them all on the tapes. They are all in there talking about it, alibis, plans, how we were going to take these businesses over and do all these other kind of stuff, and it is all right there. . . . [¶] [Defense counsel] wanted to talk about pieces of paper with respect to Brad Keyes. [¶] Here is a piece of paper. *This is a piece of paper, his agreement. He violates it, it is void. There is no question about that."* (Italics added.)

■ To preserve a claim of prosecutorial misconduct during argument, a defendant must contemporaneously object and seek a jury admonition. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 30–31 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *People v. Boyette* (2002) 29 Cal.4th 381, 432 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1333 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Bonilla concedes he never objected to any of the instances of alleged vouching during his guilt phase trial. He nevertheless argues these omissions should be excused because (1) the trial court overruled objections two years later, when counsel finally objected during the second penalty phase trial, thereby demonstrating that any objections in the earlier guilt phase would have been futile (see *Boyette*, at p. 432), and (2) this case was close (see *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]). We have never expanded the futility exception to encompass a situation where, as here, the defendant made a belated objection after forgoing multiple earlier opportunities to object, and we decline to do so here. As for the "close case" exception, we soundly repudiated it in the very case Bonilla cites (*id.* at pp. 27–34, overruling *People v. Berryman* (1936) 6 Cal.2d 331 [57 P.2d 136]), and we decline to resuscitate it here. Accordingly, we hold Bonilla forfeited his guilt phase claims on appeal.

■ We reject Bonilla's guilt and penalty phase claims on the merits as well. It is misconduct for prosecutors to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." (*People v. Huggins* (2006) 38 Cal.4th 175, 206–207 [41 Cal.Rptr.3d 593, 131 P.3d 995].) Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." (*People v. Cook* (2006) 39 Cal.4th 566, 593 [47 Cal.Rptr.3d 22, 139 P.3d 492].) The vice of such remarks is that they "may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." (*Ibid.*) However, these limits do not preclude all comment regarding a witness's credibility. " ' "[A] prosecutor is given

wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Ward* (2005) 36 Cal.4th 186, 215 [30 Cal.Rptr.3d 464, 114 P.3d 717].) "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye* (1998) 18 Cal.4th 894, 971 [77 Cal.Rptr.2d 25, 959 P.2d 183]; accord, *Ward*, at p. 215.)

The prosecutor's challenged remarks all fall within this wide latitude. The prosecutor read the contents of Keyes's plea agreement during each opening argument, but it was permissible to advise the jury of this information: " '[W]hen an accomplice testifies for the prosecution, full disclosure of any agreement affecting the witness is required to ensure that the jury has a complete picture of the factors affecting the witness's credibility.' " (*People v. Fauber* (1992) 2 Cal.4th 792, 821 [9 Cal.Rptr.2d 24, 831 P.2d 249],[9] quoting *People v. Phillips* (1985) 41 Cal.3d 29, 47 [222 Cal.Rptr. 127, 711 P.2d 423]; accord, *People v. Frye, supra,* 18 Cal.4th at p. 971.) His remaining remarks about Keyes's credibility during his two closing arguments were equally permissible. They fall into three categories: arguments that Keyes should be believed because he had an incentive to tell the truth under the terms of his plea agreement; arguments he should be believed because, despite extensive cross-examination, his preliminary hearing and trial testimony were consistent; and arguments he should be believed because other evidence in the record corroborated his testimony. These were arguments from the evidence, suggesting reasonable inferences the jury could draw that might lead it to credit Keyes's testimony. They did not suggest the prosecutor had personal knowledge of facts outside the record showing Keyes was telling the truth.

---

[9] In *Fauber*, we concluded it was error not to exclude reference to a provision reciting that the People would enter into the plea agreement only if they decided the defendant was telling the truth. (*People v. Fauber, supra,* 2 Cal.4th at p. 822.) *Fauber* is distinguishable, as there was no similar provision in Keyes's plea agreement; nothing in the agreement (including but not limited to the prosecutor's signature on it) indicated the People had made or would make any preliminary determination that Keyes was being truthful.

Nor do we agree with Bonilla's contention that because Keyes's agreement was contingent on his telling the truth, its admission was error because a jury would necessarily conclude that (1) the agreement had not yet been voided; (2) it would have been voided if the prosecutor thought Keyes was lying; and (3) the prosecutor therefore must think Keyes was telling the truth. The jury *might* believe the prosecutor thought Keyes was being truthful, but there is no reason to think it would have concluded the prosecutor had special information *outside the record* on which to base that belief, nor is there any reason to think this inference would have led the jury to conclude it no longer needed to evaluate Keyes's credibility for itself.

Nothing in the challenged remarks invited the jury to abdicate its responsibility to independently evaluate for itself whether Brad Keyes should be believed. There was no prosecutorial misconduct.

### B. *Circumstantial Evidence Instruction (CALJIC No. 2.01)*

At both the guilt and penalty phases, the jury was instructed with CALJIC No. 2.01, a standard instruction on the treatment of circumstantial evidence. The last paragraph of the instruction provided: "If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." Bonilla contends this instruction violated his state and federal due process rights, jury trial rights, and right to a reliable capital trial (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17) because (1) it compelled the jury to accept any reasonable interpretation of the evidence, and thus convict him based on a standard of proof of less than beyond a reasonable doubt, and (2) it impermissibly shifted the burden of proof to Bonilla by granting the prosecution a rebuttable presumption that any reasonable interpretation of the evidence it proffered was correct unless Bonilla could produce a competing alternate reasonable interpretation.

■ We have repeatedly rejected both arguments. CALJIC No. 2.01 does not alter the burden of proof, nor does it create a mandatory presumption of guilt. (E.g., *People v. Koontz* (2002) 27 Cal.4th 1041, 1084–1085 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Kipp, supra,* 18 Cal.4th at pp. 374–375; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Bonilla offers no persuasive reason to reconsider our settled interpretation of CALJIC No. 2.01, and we decline to do so.

### III. *Penalty Phase Retrial Claims*

### A. *Failure to Strike Jurors for Cause*

Bonilla contends the trial court erred by refusing to strike for cause two prospective jurors, James B. and Robert F., who he contends indicated they would automatically vote for death if first degree murder were proven.

■ "The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence." (*People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103]; accord, *People v. Crittenden, supra,* 9 Cal.4th at pp. 120–121.)

However, a "juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*Crittenden*, at p. 121, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].)

" 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]" [Citation.]' " (*People v. Boyette, supra,* 29 Cal.4th at p. 416; accord, *People v. Moon* (2005) 37 Cal.4th 1, 14 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

To preserve an objection to the trial court's failure to excuse a juror for cause, a defendant must (1) exercise a peremptory challenge against the juror in question, (2) exhaust all peremptories, and (3) express dissatisfaction with the jury as finally empanelled. (*People v. Ramirez* (2006) 39 Cal.4th 398, 448 [46 Cal.Rptr.3d 677, 139 P.3d 64]; *People v. Avila* (2006) 38 Cal.4th 491, 539 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Weaver, supra,* 26 Cal.4th at pp. 910–911; *People v. Crittenden, supra,* 9 Cal.4th at p. 121.) It is undisputed Bonilla exercised peremptories against both James B. and Robert F. and eventually exhausted both his individual and joint peremptories, but the People contend Bonilla forfeited his claim by failing to adequately express dissatisfaction.

The record is ambiguous. After the jury was selected, counsel for Nichols reiterated that various challenges for cause had been denied; that he had sought additional peremptories; and that, had he had additional peremptories, he would have used them on one or more jurors who were ultimately empanelled. He concluded: "So the record should reflect I object to the panel as chosen, and I made every attempt to obtain additional challenges when I exhausted my individual and joint challenges." Counsel for Bonilla added only the following: "For the record, we used two challenges. One on Mr. [F.] and one on Mr. [G.] They are the ones I called to the Court's attention, both of whom have [vacations] that [conflict] with our trials."

We need not decide whether this ambiguous statement was intended to piggyback on Nichols's counsel's objections and express similar dissatisfaction with the final composition of the jury. Even if it were not, and Bonilla's claims consequently might be subject to a procedural bar, we have acknowledged that the law on the need to express dissatisfaction was in a state of flux until late 1994, after Bonilla's mid-1994 penalty retrial jury selection. (See *People v. Boyette, supra,* 29 Cal.4th at p. 416; *People v. Weaver, supra,* 26 Cal.4th at p. 911.) On that basis, we declined to enforce a procedural bar in *Boyette* and *Weaver,* and we do so again here.

On the merits, the People do not defend the trial court's failure to excuse Prospective Jurors James B. and Robert F., arguing instead that this case is analogous to *People v. Boyette, supra,* 29 Cal.4th at pages 417–419, in which we found error in the trial court's refusal to excuse a juror for cause, but ultimately found the error harmless. Without deciding whether there was error, we agree Bonilla has failed to demonstrate prejudice from the refusal to excuse James B. and Robert F.

■ Because Nichols and Bonilla exercised joint peremptory challenges against James B. and Robert F., they did not sit on the jury. The harm from any theoretical error was thus confined to the loss of additional peremptory challenges. (See *People v. Avila, supra,* 38 Cal.4th at p. 540; *People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) "[T]he loss of a peremptory challenge in this manner ' "provides grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*" ' " (*Yeoman,* at p. 114.) Bonilla contends he was subjected to just this harm because Juror Dario L. was seated after Bonilla had exhausted all his peremptories. But while Bonilla asserts he challenged Dario L. for cause, the record reflects no such challenge.[10] Thus, as in *Yeoman,* Bonilla was not forced to accept a juror incompetent under *Wainwright v. Witt, supra,* 469 U.S. 412, and can show no prejudice. Accordingly, we reject his argument that the refusal to excuse jurors for cause violated his constitutional rights.

## B. Wheeler/Batson *Motions*

During jury selection at the penalty phase retrial, Bonilla objected to the prosecution's use of peremptory challenges to excuse women, Hispanics, and

[10] Nor would there have been any basis for a *Wainwright* challenge; Dario L.'s voir dire demonstrates no views so strong that they would have impaired his ability to serve as a juror. Dario L. could vote for death, "but it would have to be black and white. I mean, the evidence would have to be there." He could vote for life "because I have to be open to the evidence and the circumstances and the judge's instructions." He had no leaning toward either a life or death sentence.

African-Americans. The trial court considered and rejected these motions, concluding Bonilla had failed to make out a prima facie case that the prosecution was engaged in impermissible discrimination. The jury as seated included no African-Americans, one Hispanic, and five women.[11]

Bonilla renews these claims on appeal. We find no error.

Both the state and federal Constitutions prohibit the use of peremptory challenges to exclude prospective jurors based on race or gender. (*People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748]; *Batson v. Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 130–131 [128 L.Ed.2d 89, 114 S.Ct. 1419].) Such a use of peremptories by the prosecution "violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila, supra*, 38 Cal.4th at p. 541.)

There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769]; *People v. Griffin* (2004) 33 Cal.4th 536, 554 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Johnson* (2003) 30 Cal.4th 1302, 1309 [1 Cal.Rptr.3d 1, 71 P.3d 270], overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410].) To do so, a defendant must first "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial [or gender] exclusion' by offering permissible race-neutral [or gender-neutral] justifications for the strikes. [Citations.] Third, '[i]f a race-neutral [or gender-neutral] explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful . . . discrimination.' [Citation.]" (*Johnson v. California*, at p. 168, fn. omitted.) The same three-step procedure applies to state constitutional claims. (*People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].)

Ordinarily, we review the trial court's denial of a *Wheeler/Batson* motion deferentially, considering only whether substantial evidence supports its conclusions. (*People v. Avila, supra*, 38 Cal.4th at p. 541.) However, the

---

[11] Bonilla is a Spanish-American male.

United States Supreme Court recently concluded that California courts had been applying too rigorous a standard in deciding whether defendants had made out a prima facie case of discrimination. (See *Johnson v. California*, *supra*, 545 U.S. at pp. 166–168 [holding the requirement a defendant show a "strong likelihood," rather than a "reasonable inference," of discrimination was inconsistent with *Batson* and the federal Constitution].) In cases where the trial court found no prima facie case had been established, but whether it applied the correct "reasonable inference" standard rather than the "strong likelihood" standard is unclear, "we review the record independently to 'apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis." (*People v. Bell*, *supra*, 40 Cal.4th at p. 597; accord, *People v. Williams* (2006) 40 Cal.4th 287, 310 [52 Cal.Rptr.3d 268, 148 P.3d 47]; see *People v. Avila*, *supra*, 38 Cal.4th at pp. 553–554.)

In deciding whether a prima facie case was stated, we consider the entire record before the trial court (e.g., *People v. Yeoman*, *supra*, 31 Cal.4th at p. 116), but certain types of evidence may be especially relevant: "[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group— and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*People v. Wheeler*, *supra*, 22 Cal.3d at pp. 280–281, fn. omitted.)

### 1. *Use of peremptories against African-Americans*

There were two African-Americans, Rosalind H. and David L., in the 78-person juror pool; the prosecution struck them both. Nichols made a *Batson/Wheeler* motion objecting to the removal of African-Americans, which Bonilla joined. The trial court denied the motion, finding "no systematic exclusion of Blacks." We agree with the trial court that Bonilla made no prima facie showing that the two prospective African-American jurors were challenged because of their race.

Bonilla relies principally on the fact that all African-Americans—two of two—were struck from the juror pool. It is true the prosecution used

peremptories to challenge both African-Americans in the pool, but "the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.' " (*People v. Bell, supra,* 40 Cal.4th at p. 598, quoting *People v. Harvey* (1984) 163 Cal.App.3d 90, 111 [208 Cal.Rptr. 910]; see also *People v. Turner* (1994) 8 Cal.4th 137, 167–168 [32 Cal.Rptr.2d 762, 878 P.2d 521].)[12] Bonilla does not contend the prosecution's questioning of Rosalind H. and David L. was cursory or materially different from the questioning of non-African-American jurors. Nor is Bonilla African-American.

Moreover, the information elicited in voir dire showed race-neutral reasons for excusing both prospective jurors. Defense counsel freely conceded, "With respect to Miss [H.] and Mr. [L.], Miss [H.] represents a close case, given the fact her husband suffered a previous [felony] conviction and her father had been convicted of killing his brother." (See *People v. Garceau* (1993) 6 Cal.4th 140, 172 [24 Cal.Rptr.2d 664, 862 P.2d 664] [recognizing peremptory may be used to excuse juror whose relatives have had negative criminal justice system experiences].) The prosecutor relied on this, as well as the fact Rosalind H. felt the death penalty was randomly imposed. As for David L., the prosecutor cited questionnaire and voir dire answers that suggested hesitation about the death penalty, as well as his perception that David L. failed to respond when the court asked the prospective jurors whether they could follow the law. The trial court correctly concluded no prima facie case of group bias against African-Americans had been established.[13]

---

[12] As we have previously explained, "the ultimate issue to be addressed on a *Wheeler-Batson* motion 'is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias.' [Citation.] But in drawing an inference of discrimination from the fact one party has excused 'most or all' members of a cognizable group"—as Bonilla asks the court to do here—"a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges." (*People v. Bell, supra,* 40 Cal.4th at p. 598, fn. 3.) Such a pattern will be difficult to discern when the number of challenges is extremely small.

[13] Though not strictly required, it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out. This may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 723–724 [60 Cal.Rptr.2d 1, 928 P.2d 485] [even where no prima facie case found, court may properly consider reasons actually given by the prosecutor].)

### 2. *Use of peremptories against Hispanics*

There were eight Hispanics in the juror pool. The prosecution struck three Hispanic women, Gavina D., Carla G., and Nellie D. The defense struck four Hispanic men. One Hispanic man served on the final jury. Nichols made a *Batson/Wheeler* motion, objecting to the use of strikes against Hispanics, and Bonilla joined the motion. The trial court denied it, concluding: "On this record, I make a finding there was no attempt to discriminate or excuse Hispanics from this jury." Bonilla resumes this argument on appeal, contending that statistical evidence—the prosecution's exclusion of all three Hispanic women—alone establishes a prima facie case. We disagree.

Preliminarily, the statistical frequency with which the prosecution struck Hispanics from the juror pool provides no basis at all to infer discrimination. Hispanics comprised approximately 10 percent of the pool (eight of 78), the prosecution used 10 percent of its challenges on Hispanics (three of 30), and the final jury was roughly 10 percent Hispanic (one of 12). Bonilla of course is a Hispanic male, but the prosecution used not a single strike against any Hispanic male, and a Hispanic man sat on the jury.

Perhaps because of this, Bonilla at various points frames his objection as one against the exclusion of Hispanic women. Whether or not Hispanic women constitute a separate cognizable group for *Wheeler/Batson* purposes, distinct from both women generally and Hispanics generally,[14] on these facts this shifting approach smacks of data dredging. That is, given numerous (increasingly small) subcategories and cross-categories of individuals, one is increasingly likely to find, somewhere, a particular category for which one side or the other happens to have stricken most or all of the (few) members of the group—not for reasons of discrimination, but as a simple consequence of the laws of probability. In such circumstances, the force of any corresponding inference of discrimination will necessarily be weakened. Moreover, while it so happens the prosecution's use of peremptories resulted in the exclusion of all three Hispanic women, defining the relevant category in this way means Bonilla is no longer a member of the relevant group and no longer benefits from whatever force his group membership would otherwise have had in supporting an inference of discrimination. The record further indicates that for one of the three Hispanic women, Nellie D., the prosecutor did not realize she was Hispanic. Where a prosecutor is unaware of a prospective juror's group status, it logically follows he cannot have discriminated on the basis of that status. (See *People v. Barber* (1988) 200 Cal.App.3d 378, 389, 394 [245 Cal.Rptr. 895].) Bonilla offers no reason, beyond the ratio of Hispanics struck to those in the juror pool, to conclude the prosecutor discriminated against Hispanics or Hispanic women in his use

---

[14] We have assumed as much. (*People v. Garceau, supra,* 6 Cal.4th at p. 171.)

of peremptories, and the record amply supports the trial court's conclusion that he failed to make out a prima facie case of group bias against Hispanics.

### 3. *Use of peremptories against women*

The juror pool included 48 men and 30 women. The prosecution used 20 strikes on women (and 10 on men), while the defense used five strikes on women (and 25 on men). As a result, the final jury included seven men and five women. Nichols made numerous *Wheeler* challenges to the prosecution's striking of women, and midway through jury selection Bonilla indicated he joined in Nichols's *Wheeler* motions. The trial court denied the motions without seeking further explanation from the prosecution for its strikes, implicitly concluding the defense had not made out a prima facie case of group bias against women.

The People argue Bonilla failed to preserve objections to all but eight of the women the prosecution struck. We disagree. As the People acknowledge, during a recess in jury selection to address *Wheeler/Batson* issues, Bonilla joined in Nichols's pending *Wheeler/Batson* motions (which then included challenges to the use of eight strikes on women). The prosecution sought to preclude any further interruption of jury selection, not wanting defense counsel to engage in speaking motions that would highlight for the jurors their concerns the prosecution was discriminating, and offered to stipulate that all *Wheeler/Batson* objections would be deemed preserved and could be taken up at the close of jury selection. The trial court was unsatisfied with this approach, which would make it more difficult for it to track and evaluate defense objections, and eventually directed Nichols's counsel to simply interject the single word "motion" after any strike challenged on *Wheeler/Batson* grounds. It is unclear from the record whether the parties understood Nichols's interjection would suffice for both defendants, just as in exercising the two defendants' joint peremptory challenges during jury selection one counsel would frequently speak for both parties. It is similarly unclear whether Bonilla's counsel intended his joinder in Nichols's *Wheeler/Batson* motions to cover only those then pending or those going forward as well. Given these ambiguities, we decline to find a forfeiture of additional *Wheeler/Batson* claims based on Bonilla's counsel's failure to echo Nichols's counsel's interjection of the word "motion" during the remainder of jury selection.

Turning to the merits, Bonilla again rests his claim solely on a statistical analysis of the prosecution's strikes. While the juror pool contained 38 percent women (30 out of 78), the prosecution used 67 percent of its strikes on women (20 out of 30). Closer analysis, however, reveals this apparent disparity is not all it appears.

First, the ultimate composition of the jury (42 percent women) mirrored that of the juror pool (38 percent women). (See *People v. Ward, supra,* 36 Cal.4th at p. 203 [ultimate composition of the jury is a factor to be considered in evaluating a *Wheeler/Batson* motion]; *People v. Turner, supra,* 8 Cal.4th at p. 168 [same].) Indeed, after the prosecution expended its final peremptory, the jury stood at six men and six women; only Bonilla's subsequent use of his final individual strikes reduced the jury to five women. The defense challenged the prosecution's use of peremptories against prospective jurors in seats 1, 3, 5, 6, and 9 as gender biased, but near the end of jury selection the prosecution passed, accepting the jury, despite the fact women held every one of those seats. By the time the prosecution used its final peremptory strike—to remove a man from the jury—four of those five contested seats were held by women.[15] Thus, the prosecution's pattern of peremptories does not suggest it attempted to, nor did it in fact, deprive Bonilla of a jury containing a fair cross-section of men and women.

Second, looking only at the overall juror pool exaggerates any discrepancy between the prosecutor's use of strikes and the juror pool composition. Two male jurors were excused, four male jurors were never called or failed to appear, four male jurors were called and seated after the prosecution had exhausted its challenges, and seven male jurors (and two female jurors) were challenged by the defense immediately on seating, before the prosecution had any opportunity to act. Thus, the pool the prosecution had the opportunity to challenge was actually 47 percent female (28 out of 59).

Third, the record discloses gender-neutral reasons for the strikes Bonilla objected to under *Wheeler*. Rosalind H. was the first challenged woman to draw a *Wheeler/Batson* motion; her husband had a prior conviction, and her father had been convicted of killing his brother. Moreover, the record establishes the defense challenged the use of a strike against her not because she was a woman, but because she was African-American. As noted above, Bonilla failed to make out a prima facie case of discrimination against African-Americans.

The defense next challenged the use of a strike against Carla G. The prosecutor explained that he struck Carla G. because she would not directly answer his questions, leaving him uncertain whether he could trust that he knew where she really stood. The record supports this. Carla G. gave a series of equivocal answers about whether she could impose the death penalty, described her feelings about the death penalty as "mixed" in her juror questionnaire, and gave no answer to questions about her thoughts on life

[15] As to the fifth seat (seat 9), it too was held by several women after the prosecution's challenged strike of Nellie D., but the defense challenged the first, and Bonilla removed the second with one of his final individual challenges.

without the possibility of parole. She further indicated she believed the death penalty was imposed "randomly" and that it should be reserved for "heinous crimes" such as "mass murderers or children killers."[16]

Next, the defense challenged the use of strikes against Shirley C., Laura M., Joanne M., and Ramona T.

Shirley C. indicated in her questionnaire that she had served on a jury on three previous occasions, two of which had resulted in a hung jury. Her initial reaction to being put in the position of making a life-or-death decision was that she would be "kind of uncomfortable," although "hopefully" she would be "strong enough to make the right decision."

Laura M., like Rosalind H., had a close relative (her brother) who was serving time for a felony conviction. She described herself as moderately in favor of the death penalty but strongly in favor of life in prison without possibility of parole, and identified the circumstances warranting the death penalty in her mind as "mass murders, child murders."

Joanne M. described herself as "liberal." She believed the death penalty was imposed "randomly." She noted she was a Catholic and the "Catholic Church stands against the death penalty," but she indicated this would not affect her ability to choose either life or death. She believed the death penalty was appropriate for "the most heinous crimes where victims were made to suffer or died an especially violent death," as well as "especially brutal [crimes] . . . that caused the victim intense suffering before he/she died," while life without possibility of parole should apply to murders that did not satisfy these criteria. In addition, she was newly pregnant and expressed extreme uncertainty over how this might affect her service or her ability to decide that another person should die. Asked again whether she could go through with sentencing someone to death, she indicated: "I think I would balk a little bit. I don't even know if it is because of my emotional state right now, but it kind of gives me the—I don't know. I would feel bad, I think, if it came down to that."

In each of these three cases, the juror's responses would give reason enough for a prosecutor to consider a peremptory, without regard to the juror's sex.

Ramona T.'s questionnaire was virtually blank with respect to her view about the criminal justice system and the death penalty; it gave essentially no

---

[16] The defense did not independently and contemporaneously challenge the strikes of Gavina D. and Nellie D., the other two Hispanic women, but argued their exclusion supported the case that the strike of Carla G. showed discrimination against Hispanic women. As noted above, Bonilla made no prima facie case of discrimination against Hispanic women.

insight into her views other than that she had given them little thought. Asked how important the fact someone had been killed would weigh in her life-or-death calculus, she replied opaquely, "If I feel that is fair, then, no, it is not important." Asked whether the fact "that money is involved or financial gain in your own personal value system, is that something important to you as to make any difference between the death penalty or life without possibility of parole should apply?," she replied, "No." Asked whether her view that life or death might be appropriate in any case would extend to a situation where the defendant murdered more than 10 people, or blew up an airplane and killed 80 people, she indicated again that either life or death might be appropriate. Finally, she described herself as "a very strong person emotionally and I will develop my own opinion." The difficulty from a prosecution or defense perspective is that it was virtually impossible to glean from her voir dire or questionnaire any clue as to what those opinions might be. Ramona T. thus presented a wild card, even more so than Carla G. Given her indication that murder for financial gain was not a factor she considered important, the prosecutor could reasonably have used a peremptory for reasons unconnected to Ramona T.'s sex.

After a short conference to address Nichols's (and Bonilla's) first six *Wheeler/Batson* motions, jury selection continued, and the defense challenged the use of peremptories against five additional prospective female jurors: Anne E., Candice M., Carol L., Barbara B., and Victoria D. Again, the record discloses gender-neutral reasons why a prosecutor might consider these prospective jurors less than ideal and elect to use one of his 30 peremptories to remove them from a penalty phase jury.

Anne E. described herself in her questionnaire as a political liberal. She described the death penalty as acceptable in principle, but "[t]he circumstance[s] must be of such a nature that the sentence is the only one at which to arrive." While she was neutral toward the death penalty, she was strongly in favor of life in prison without possibility of parole. She described some methods of execution as "criminal as to suffering of the executed" and "medieval." She identified the best arguments *for or against* the death penalty as "innocence of crime—inhumane techniques."

Candice M. indicated she did not believe the death penalty should be used often and instead should be reserved "[o]nly for the most heinous of crimes." She identified those deserving death as "mass murderers [and] people who torture their victims." While strongly in favor of life without possibility of parole, she was less strongly in favor of the death penalty. During voir dire, she indicated, "But just [as to the] scale between death and life imprisonment, I would have to say that my scale might be a little uneven towards life imprisonment," and confirmed in response to a followup question that,

indeed, her personal scales had a small but clear preexisting tilt towards life in prison rather than death.

Carol L. gave little or no written responses in her questionnaire, checking "yes" or "no" boxes without elaboration and leaving most questions blank or responding "No" or "None" when asked her views and attitudes. Her rare elaborations were semiliterate (e.g., "Q: What are your general feelings concerning the death penalty? [¶] A: Some one was murdered, and the a [*sic*] person was sentenced—yes.") Voir dire shed only minimal additional light.

Barbara B. described herself as a liberal. She expressed concern about news reports indicating executions are not painless and on the death penalty described herself as "confused and uncertain—on one hand it makes sense that it is the correct punishment for a crime, on the other hand killing someone seems wrong." Asked how she would vote if whether to have the death penalty were on the ballot, she indicated she was unsure; asked what she thought the best argument *for or against* the death penalty was, she replied, "The best argument against [the death penalty] is that it is wrong to kill another person under any circumstances." Asked whether she thought the death penalty should apply to most premeditated murders, or only the most heinous crimes, she replied, "Heinous crimes."

Finally, Victoria D. indicated that, like Shirley C., she had prior jury experience, and the previous jury she had served on, in a drug case, had deadlocked without reaching a verdict. Asked about this experience, she emphasized the defendant was not found with any drugs on him, just money and a pager; she later reported the jury was six to six, she was fine with her decision, and if she served again, she again would adhere to her views and have no problem sitting on a hung jury. One might reasonably speculate from these comments there was a fair chance she was among the six jurors who held out for acquittal. In other questionnaire responses, Victoria D. indicated she believed the death penalty was imposed randomly and was unsure whether she would vote to retain it because she was unsure whether it was fairly handed out. Nor was she sure what circumstances *should* warrant the death penalty or life without possibility of parole.

In sum, for each strike the defense challenged under *Wheeler/Batson*, the record reflects reasonable gender-neutral bases for use of a peremptory challenge. The trial court did not err in concluding no prima facie case of group bias against women had been made out.

### 4.  *Comparative juror analysis*

For the first time on appeal, Bonilla identifies in his reply brief five jurors who ultimately sat on the jury who he contends are materially indistinguishable from the jurors the prosecution struck. By waiting until his reply brief to

argue that the prosecution's use of strikes should be subjected to a comparative juror analysis, Bonilla has forfeited the issue. (E.g., *People v. Smithey* (1999) 20 Cal.4th 936, 1017, fn. 26 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

■ In any event, this is a "first-stage" *Wheeler/Batson* case, in that the trial court denied Bonilla's motions after concluding he had failed to make out a prima facie case, not a "third-stage" case, in which a trial court concludes a prima facie case has been made, solicits an explanation of the peremptory challenges from the prosecutor, and only then determines whether the defendant has carried his burden of demonstrating group bias. We have concluded that *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] does not mandate comparative juror analysis in these circumstances (*People v. Bell, supra*, 40 Cal.4th at p. 601), and thus we are not compelled to conduct a comparative analysis here. Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis here.

### C.  *Failure to Inquire into and Discharge Juror for Sleeping*

Bonilla contends he was deprived of his constitutional right to a fair trial and due process by the trial court's alleged failure to adequately investigate and act on allegations that two jurors were sleeping during the penalty phase. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.) We discern no abuse of discretion; to the contrary, the trial court promptly and fully investigated, and granted the only motion for discharge supported by the evidence.

■ The trial court has the authority to discharge jurors for good cause, including sleeping during trial. (*People v. Bradford, supra*, 15 Cal.4th at pp. 1348–1349; § 1089.) When the trial court receives notice that such cause may exist, it has an affirmative obligation to investigate. (*Bradford*, at p. 1348; *People v. Burgener* (1986) 41 Cal.3d 505, 520–521 [224 Cal.Rptr. 112, 714 P.2d 1251].) Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court. (*Bradford*, at p. 1348.)

Here, the court received a written note from Juror No. 12, filed October 17, 1994, which advised the court that due to an extended night shift work schedule, he had "drifted off to sleep a couple of times this past week." The juror requested a note reprimanding him for falling asleep during the trial, in the hope that his employer, presented with the note, would accommodate him with a more manageable night work schedule.

The trial court held a hearing the next day, October 18, to address both Juror No. 12 and another juror, Juror No. 6, who Nichols's counsel believed had also been sleeping. Beginning with Juror No. 12, the court and counsel inquired into the extent of his sleeping and its impact on his functioning as a juror:

"THE COURT: First of all, I did not notice [you sleeping]. I talked to the court reporter and she said she didn't notice it. So, you are telling us that you did drift off to sleep?

"[JUROR NO. 12]: Yeah, a couple times last week. [¶] See, my company went through a down-sizing and as of last Monday I had normally worked between four and six hours at night.

"THE COURT: That part we have in the letter, but are you saying that you missed a portion of the trial?

"[JUROR NO. 12]: Well, not necessarily missed it. I mean, I just nodded . . . off and came back up.

"THE COURT: *So you didn't miss anything?*

"[JUROR NO. 12]: *No, I don't think so.* [¶] . . . [¶]

"THE COURT: Anybody else have any questions to him?

"[BONILLA'S COUNSEL]: I guess I have just one for my record. . . . [W]hen you say you don't think so, I mean, my reaction is once I'm asleep I can't tell how long I have been asleep except by external things, so are you—

"[JUROR NO. 12]: Well—

"[BONILLA'S COUNSEL]: What are you saying, I guess is what I'm asking?

"[JUROR NO. 12]: It is kind of hard to explain. It was just the fact that I would feel my head go down and then I came back up.

"[BONILLA'S COUNSEL]: Okay.

"THE COURT: *So you didn't miss anything?*

"[JUROR NO. 12]: *I don't think so.*

"THE COURT: *You were listening to all the witnesses and what have you.*

"[JUROR NO. 12]: *Right.*" (Italics added.)

The inquiry thus established that, insofar as could be determined, Juror No. 12 had caught himself nodding off and promptly alerted the court, but had not yet missed any of the trial; neither the trial judge, nor the court reporter, nor apparently counsel had ever noticed him sleeping.

After further inquiry into Juror No. 6's sleeping, Bonilla and Nichols moved for a mistrial and in the alternative moved that both jurors be excused. The trial court declined to immediately dismiss the jurors, but invited defense counsel to follow up with a written motion supported by additional evidence. Thus, if in fact the problem was greater than this inquiry showed, defense counsel could submit declarations from other courtroom observers establishing that fact.

Nichols, joined by Bonilla, filed a motion with supporting declarations seeking a mistrial or in the alternative the dismissal of Juror Nos. 6 and 12. Notably, the declarations contained statements from witnesses that Juror No. 6 had been sleeping, but no additional evidence that Juror No. 12 had been sleeping.

The trial court held a further hearing on October 31, at which each side submitted live testimony and cross-examined witnesses. Asked whether they had seen any jurors sleeping, each of the defense witnesses identified only Juror No. 6; defense counsel elicited no additional evidence suggesting Juror No. 12 had been sleeping in trial or that there was an ongoing problem. The next day, the trial court granted the motion to dismiss Juror No. 6.

The trial court's handling of concerns about Juror No. 12's sleeping was well within the scope of its discretion. It held an immediate hearing at which it allowed both sides to question Juror No. 12, it satisfied itself regarding the extent of any problem, and it afforded counsel the opportunity to present additional evidence if they were dissatisfied and concerned that the scope of any sleeping problem might affect their clients' rights. Given that opportunity, defense counsel presented no additional evidence that might cause the trial court to revisit its original denial of requests for a mistrial and for dismissal of Juror No. 12.

Bonilla contends the trial court erred in failing to further inquire into Juror No. 12's sleeping after October 18. To the contrary; if the trial court was satisfied with Juror No. 12's answers, as it reasonably could have been, there was no need to inquire further absent additional evidence suggesting an

ongoing problem. Bonilla's and Nichols's witnesses, courtroom observers, offered no testimony indicating they ever witnessed Juror No. 12 sleeping. Nor was this omission the result of the trial court in any way limiting further inquiry;[17] if counsel had additional evidence that might have raised concerns about Juror No. 12, they could have presented it by declaration or at the October 31 hearing. In the absence of additional evidence, the trial court did not abuse its discretion in either conducting no further independent inquiry or in refusing to dismiss Juror No. 12.

### D. *Admission of Victim Photographs*

During the guilt phase, the prosecution submitted a dozen photographs of the grave site and Harris's mummified remains. The trial court ultimately admitted eight photographs and excluded four as cumulative. At the penalty phase, Bonilla objected to readmission of these eight photographs, arguing they were irrelevant, unduly prejudicial (because of their allegedly inflammatory nature), and cumulative. The trial court overruled the objections. Bonilla contends their admission was state law error and also deprived him of his right to a fair trial and a reliable capital sentencing determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.)[18]

"The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion." (*People v. Roldan* (2005) 35 Cal.4th 646, 713 [27 Cal.Rptr.3d 360, 110 P.3d 289]; accord, *People v. Gurule* (2002) 28 Cal.4th 557, 624 [123 Cal.Rptr.2d 345, 51 P.3d 224].) The further decision whether to nevertheless exclude relevant photographs as unduly prejudicial is similarly committed to the trial court's discretion: "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." (*Gurule*, at p. 624; accord, *People v. Moon, supra*, 37 Cal.4th at p. 34.) Notably, however, the discretion to exclude photographs under Evidence Code section 352 is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences (§ 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer

---

[17] Bonilla cites out of context a stray remark by the court at the October 31 hearing: "Wait a minute! The only question we have before us is number six." The remark came while defense counsel was cross-examining a prosecution witness; counsel asked a question specifically about the witness's observations of Juror No. 6, and the witness made a nonresponsive remark describing three other jurors as jovial. The trial court's reprimand of the witness followed.

[18] Contrary to the People's contention, this argument was preserved by Bonilla's trial objection on state law grounds. (*People v. Partida* (2005) 37 Cal.4th 428, 435–437 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

present. (*Moon*, at p. 35; *People v. Anderson* (2001) 25 Cal.4th 543, 591–592 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

■ The photographs were relevant. They show the circumstances of the crime, which include what happened to Harris's body as a consequence of Bonilla's and his coconspirators' actions. They corroborate Keyes's testimony about the use of duct tape in the killing (one of the photographs shows duct tape still attached to Harris's skull), and the details of the burial. Keyes's credibility was central to the penalty phase trial. Finally, several of the photographs were used by a pathologist to assist the jury in understanding his testimony. The admitted photographs also were not cumulative; the trial court appropriately limited admission, excluding four of the 12 photographs as cumulative.

Nor were the photographs substantially more prejudicial than probative. " ' " '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.' " ' " (*People v. Moon, supra,* 37 Cal.4th at p. 35.) Likewise here. But as unpleasant as these photographs are, they demonstrate the real-life consequences of Bonilla's actions. The prosecution was entitled to have the jury consider those consequences. The trial court's exercise of discretion to admit them was neither statutory nor constitutional error.

### E. *Admission of Hearsay Evidence of Plot to Kidnap Bonilla's Sister*

Bonilla contends the trial court erroneously permitted inadmissible hearsay to remain in the record during the penalty phase and this error rendered his trial fundamentally unfair in violation of his federal due process rights. (U.S. Const., 5th & 14th Amends.) The error was harmless and did not render his trial fundamentally unfair.

Shelton McDaniels, Bonilla's coconspirator, testified extensively about the plot to kidnap Susan Harris and extort money from her, money that would then be used to pay for killing Keyes. During that testimony, McDaniels described the growing frustration another coconspirator, Michael Cooperwood (Mut), had with Bonilla's failure to come up with additional money to pay for kidnapping Susan Harris. He testified: "Well, Mut felt like Steve [Bonilla] was lying to him about not being able to come up with the money because he had told him that his mom's [*sic*] had money tied up in . . . CD's and something else that the money was tied up in, but he couldn't access it because she was the only one that could get it or something like this. And she was reluctant as it was to give him the money. *But Mut was ready to put the pressure on him and the plan he came up with was going and kidnapping Steve's sister.*" (Italics added.)

Bonilla objected, arguing the statement was inadmissible hearsay outside the scope of the coconspirator exception because it related to matters outside the scope of the conspiracy. (See Evid. Code, § 1223.) The trial court sustained Bonilla's objection at an in-chambers conference but, once back on the record before the jury, did not advise the jury the objection had been sustained, strike the testimony, or direct the jury to disregard it.

The People do not defend either the admissibility of the testimony or the trial court's failure to cure its admission. However, the error was manifestly harmless. There is no reasonable probability exclusion of the testimony about a third party's inchoate criminal designs would have made a difference. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The real issue at the penalty phase was how to weigh the circumstances of the crime, its impact on the victims, and Bonilla's pattern of conspiring to kill those with whom he disagreed against his family's pleas for mercy and compassion. It is inconceivable this one statement on a tangential matter in a four-month trial tipped the balance. Indeed, Bonilla essentially concedes as much, acknowledging that "standing alone, erroneous admission of evidence of the plot to kidnap Bonilla's sister and to extort money from his mother may not have tipped the balance in favor of death."

Bonilla argues this state law error violated his federal due process rights. Contrary to the People's contention, the argument was preserved by Bonilla's trial objection on state law grounds. (*People v. Partida, supra,* 37 Cal.4th at pp. 435–437.) However, it is meritless. In the context of the entire penalty phase, this one line of hearsay was inconsequential and did not render Bonilla's trial fundamentally unfair. (See *id.* at p. 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].)

### F. *Prosecutorial Misconduct: Arguing Absence of Remorse*

At various points during closing argument, the prosecutor made reference to Bonilla's apparent lack of remorse. Bonilla argues these remarks constituted misconduct and deprived him of his right to a fair trial and a reliable capital sentencing determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

These claims are partially forfeited. The first time the prosecutor referenced the absence of remorse, Bonilla objected, and the court offered Bonilla additional instruction to the jury on what it could and could not consider. On a later occasion the prosecutor referenced the absence of remorse in connection with mitigation, Bonilla objected, and the court reminded the jury that it would instruct them on the correct law as it related to consideration of mitigation. Otherwise, Bonilla failed to object. As there is no indication

objection would have been futile, Bonilla's remaining claims of misconduct are forfeited. (*People v. Jablonski* (2006) 37 Cal.4th 774, 835–836 [38 Cal.Rptr.3d 98, 126 P.3d 938]; *People v. Panah* (2005) 35 Cal.4th 395, 462 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

Moreover, we conclude there was no misconduct. We have long recognized that " ' "[r]emorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told." ' " (*People v. Combs* (2004) 34 Cal.4th 821, 866 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) Prosecutors are allowed to focus on a defendant's lack of remorse in two ways. First, "[c]onduct or statements at the scene of the crime demonstrating lack of remorse may be consider[ed] in aggravation as a circumstance of the capital crime under section 190.3, factor (a)." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1184 [13 Cal.Rptr.3d 34, 89 P.3d 353]; accord, *People v. Harris* (2005) 37 Cal.4th 310, 361 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Ochoa* (2001) 26 Cal.4th 398, 448–449 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Second, "[a] prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor." (*People v. Mendoza* (2000) 24 Cal.4th 130, 187 [99 Cal.Rptr.2d 485, 6 P.3d 150]; accord, *People v. Jurado*, *supra*, 38 Cal.4th at p. 141.) In contrast, when a prosecutor does argue absence of remorse as an aggravating factor, it is misconduct. (*People v. Sims*, *supra*, 5 Cal.4th at p. 465; *People v. Keenan* (1988) 46 Cal.3d 478, 510 [250 Cal.Rptr. 550, 758 P.2d 1081].)

The prosecutor's comments on Bonilla's lack of remorse fell within these guidelines. He did not argue absence of remorse as an aggravating factor; instead, he contended the jury should consider the absence of remorse when it evaluated the mitigating circumstances: "One of the principles that I think is very significant in terms of this concept of mitigating evidence is this issue of remorse. In their case, there has been a total lack of remorse shown by the evidence by either of these two defendants, and before you consider any mitigating evidence, the fact that there has been no remorse shown whatsoever should weigh very heavily against even considering any of that in mitigation." Later: "Again, it is this effort to get you off the real issues, whether there is any mitigation that is sufficient to allow you to give [them] less than what the evidence shows they deserve. [¶] And again, before you can get to that point where the mitigation is something you should even consider, they ought to be able to, they ought to express some remorse before they are entitled to any mitigation." Finally: "And then the horror of the discovery and knowing what had become of [Harris], chewed up by the animals. That is what we talk about when we talk about the circumstances of the crime, those things you ought to consider and that remorse, that lack of

remorse before you are, you ever, ever, consider any mitigation. Because what we're talking about is responsibility. Neither of these two men are taking any responsibility, and it doesn't appear they ever will. How could sympathy or mercy be applicable to them?"

The gist of the prosecutor's argument throughout, as most clearly reflected in these final remarks, was that because Bonilla had shown no remorse, the jury should take his mitigating evidence, which amounted to a plea for mercy from his family, with a grain of salt, and should be less inclined to grant him mercy. We have consistently approved similar arguments. (See *People v. Jurado, supra,* 38 Cal.4th at p. 141 [argument permissible where reasonable jury would have understood prosecutor to be arguing lack of remorse showed the " 'defendant was not entitled to the jury's sympathy' "]; *People v. Pollock, supra,* 32 Cal.4th at p. 1184 [allowing argument that "You can consider his lack of remorse later on as just tending to show there isn't any mitigation or the mitigation is not worthy of your consideration"]; *People v. Crittenden, supra,* 9 Cal.4th at pp. 146, 148–149 [allowing argument that jury should "ask to see at least some evidence of remorse" by the defendant before extending him sympathy and considering life without the possibility of parole].) There was no misconduct.

### G.  *Refusal of Lingering Doubt Instruction*

Bonilla requested that the jury be specifically instructed it could consider any lingering doubt about his guilt as a factor in mitigation.[19] The trial court refused, explaining that it thought the proposed instruction unnecessary and confusing. Bonilla contends that refusal denied him due process and violated the Eighth Amendment to the United States Constitution.

As Bonilla concedes, we have repeatedly rejected the argument that a specific instruction on lingering doubt as a mitigating factor is constitutionally required. (E.g., *People v. Demetrulias, supra,* 39 Cal.4th at p. 42; *People v. Gray* (2005) 37 Cal.4th 168, 231–232 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461].) He asks us to disregard settled precedent because, he contends, many of our previous cases rely, directly or indirectly, on *Franklin v. Lynaugh* (1988) 487 U.S. 164 [101 L.Ed.2d 155, 108 S.Ct. 2320], where no lingering

---

[19] The proposed instruction read: "Each individual juror may consider, as a mitigating circumstance, any residual or lingering doubt in the mind of that juror, as to whether defendant STEVEN WAYNE BONILLA intended that Jerry Harris be killed. You may not relitigate or reconsider matters which were resolved in the guilt phase, but you may consider such residual or lingering doubt, if it exists in your mind, as a circumstance in mitigation. [¶] A lingering or residual doubt is defined as that state of mind between beyond a reasonable doubt and beyond all possible doubt."

doubt instruction was required in part because the defendant failed to argue lingering doubt during the penalty phase. (*Id.* at p. 175, fn. 7.) Here, in contrast, Bonilla argued lingering doubt extensively.

This argument misconstrues our precedents. Even in cases where the defendant argues lingering doubt, we have consistently rejected any constitutional requirement that a specific instruction be given, because instructions that the jury may consider the circumstances of the crime and any other extenuating circumstances (CALJIC No. 8.85; § 190.3, factors (a), (k)) adequately inform the jury that it may consider any lingering doubts. (*People v. Demetrulias, supra,* 39 Cal.4th at p. 42; *People v. Gray, supra,* 37 Cal.4th at p. 232; *People v. Earp* (1999) 20 Cal.4th 826, 903–904 [85 Cal.Rptr.2d 857, 978 P.2d 15].) These instructions were given here. The trial court did not err in concluding Bonilla's additional proposed instruction was superfluous.

### H. *Constitutionality of California's Death Penalty*

Bonilla raises a series of challenges to the constitutionality of California's death penalty. We have rejected each challenge before. As Bonilla offers no compelling arguments in favor of reconsidering any of these rulings, we do so again.

"California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty." (*People v. Demetrulias, supra,* 39 Cal.4th at p. 43.) While Bonilla contends the ballot arguments in favor of Proposition 7 (approved by voters, Gen. Elec. (Nov. 7, 1978)), which became the current death penalty law, reflect an intent to expose every murderer to the death penalty, we have rejected that assertion as a misconstruction of the ballot arguments. (*People v. Gray, supra,* 37 Cal.4th at p. 237, fn. 23.)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Smith* (2005) 35 Cal.4th 334, 373 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

Nothing in the state or federal Constitution requires that the penalty jury (1) issue written findings, (2) unanimously agree on any particular aggravating circumstances, or (3) find true any particular aggravating circumstances beyond a reasonable doubt. (E.g., *People v. Demetrulias, supra,* 39 Cal.4th at pp. 40, 43; *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271,

65 P.3d 749]; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) While Bonilla argues we should reconsider these conclusions in light of *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], which impose procedural constraints on fact finding in criminal trials, that argument rests on a misconception concerning the nature of California's capital sentencing scheme. "[T]he ultimate determination of the appropriateness of the penalty and the subordinate determination of the balance of evidence of aggravation and mitigation do not entail the finding of facts that can increase the punishment for murder of the first degree beyond the maximum otherwise prescribed. Moreover, those determinations do not amount to the finding of facts, but rather constitute a single fundamentally normative assessment [citations] that is outside the scope of *Ring* and *Apprendi*." (*People v. Griffin, supra,* 33 Cal.4th at p. 595; accord, *Snow,* at p. 126, fn. 32.)

The trial court is not constitutionally required to instruct the jury on a burden of proof; in California, at the penalty phase there is no burden of proof, only a normative judgment for the jury. (E.g., *People v. Demetrulias, supra,* 39 Cal.4th at p. 40; *People v. Moon, supra,* 37 Cal.4th at pp. 43–44; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

Comparative proportionality review, also known as intercase proportionality review, is not required to render California's sentencing scheme constitutional. (E.g., *People v. Demetrulias, supra,* 39 Cal.4th at p. 44; *People v. Gray, supra,* 37 Cal.4th at p. 237; *People v. Cunningham* (2001) 25 Cal.4th 926, 1042 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

Likewise, consideration by the jury of unadjudicated criminal conduct at the penalty phase does not violate the state or federal Constitution. (E.g., *People v. Demetrulias, supra,* 39 Cal.4th at p. 43; *People v. Gray, supra,* 37 Cal.4th at p. 236.) Nor do *Ring v. Arizona, supra,* 536 U.S. 584, and *Apprendi v. New Jersey, supra,* 530 U.S. 466, require the jury to unanimously agree beyond a reasonable doubt on any prior criminal conduct before considering it; as previously discussed, these decisions are inapplicable to California's capital sentencing scheme. (*People v. Griffin, supra,* 33 Cal.4th at p. 595; *People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32.)

The inclusion of the adjectives "extreme" and "substantial" in the list of mitigating factors (§ 190.3, factors (d) & (g)) does not impermissibly constrict consideration of mitigating evidence and is consistent with the state and federal Constitutions. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

The trial court was not constitutionally required to instruct the jury that section 190.3's mitigating factors could be considered only as mitigating factors and that the absence of evidence supporting any one of them should not be viewed as an aggravating factor. (E.g., *People v. Gray, supra*, 37 Cal.4th at p. 236; *People v. Boyette, supra*, 29 Cal.4th at pp. 465–466; *People v. Bolin* (1998) 18 Cal.4th 297, 341–342 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

The equal protection clause does not require that California include in its capital sentencing scheme the same disparate sentence review previously provided noncapital convicts under the Determinate Sentencing Act of 1976 (Pen. Code, § 1170). (*People v. Boyette, supra*, 29 Cal.4th at p. 466, fn. 22.)

Bonilla's argument that "the use of capital punishment 'as *regular punishment* for substantial numbers of crimes' violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)" (*People v. Demetrulias, supra*, 39 Cal.4th at pp. 43–44.)

## I. *Cumulative Prejudice from Errors*

We have identified one arguable error during the penalty phase: the failure to cure admission of inadmissible hearsay concerning a plot to kidnap Bonilla's sister. We have also assumed without deciding that the refusal to excuse Prospective Jurors James B. and Robert F. for cause was error. Having concluded each independently was harmless, we likewise conclude that the cumulative effect of these asserted errors was not prejudicial and does not require reversal of Bonilla's conviction and death sentence.

## DISPOSITION

The trial court's judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 8, 2007.