Filed 11/4/15  P. v. Hill CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DARRYL BERNARD HILL,<br><br>　　　Defendant and Appellant. | B258929<br><br>(Los Angeles County<br>Super. Ct. No. KA102950) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas Sortino, Judge.  Affirmed.

David W. Scopp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Michael R. Johnsen and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Darryl Bernard Hill appeals from his judgment of conviction of one count of second degree robbery (Pen. Code,[1] § 211) and one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), with true findings on the sentence enhancement allegations that Hill personally inflicted great bodily injury (§ 12022.7, subd. (a)). On appeal, Hill contends the prosecution improperly exercised one of its peremptory challenges to excuse an African-American prospective juror in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Hill also claims the evidence was insufficient to support the jury's findings that he personally inflicted great bodily injury on the victim during the commission of the charged crimes. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Charges

The Los Angeles County District Attorney charged Hill with one count of second degree robbery (§ 211) and one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)). As to each count, it was alleged that Hill personally inflicted great bodily injury during the commission of the offense (§ 12022.7, subd. (a)). It also was alleged that Hill had served three prior prison terms within the meaning of section 667.5, subdivision (b), and had two prior serious or violent felony convictions within the meaning of section 667, subdivision (a)(1), section 1170, subdivision (h)(3), and/or the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Hill pleaded not guilty to each count and denied the enhancement allegations.

---

[1] All further statutory references are to the Penal Code.

**II. The Evidence at Trial**

    **A. Prosecution Evidence**

        **1. Trial Testimony**

On August 23, 2013, at approximately 3:30 p.m., Evan Jackson went to Joo's Market, a liquor store in Pomona, California, to purchase a drink. He was carrying $1,600 in his left front pants pocket. After parking his car, Jackson spoke briefly with a group of people standing in front of the store. Jackson then went inside the store where he was approached by Hill. Jackson had never seen Hill before that day. The two men had a short conversation inside the store.

Immediately after Jackson walked out of the store, he was attacked by Hill and two other men. One of the other men initially punched Jackson on the left side of his face, causing him to fall to the ground. All three men, including Hill, then began beating him. Jackson felt all three men hit him in his face and stomach. He also felt himself being dragged on the sidewalk and lifted off the ground. At some point, Hill reached into Jackson's left pants pocket and took his money. Hill then rode away on a bicycle while the other two men fled on foot. After the assault, Jackson's left eye was severely bleeding and swollen shut. Jackson's wallet, identification card, and $1,600 were taken from him during the assault.

Jackson was transported by ambulance to a local hospital. Due to the severity of the injury to his left eye, however, he had to be transferred to a different hospital for treatment by an eye specialist. Jackson required surgery on his left eye. As a result of the assault, he has a permanent scar over his left eye, continues to experience blurred vision, and must now wear prescription glasses to correct his vision in the affected eye.

Pomona Police Officer Michael Lee responded to the scene following the assault. He obtained surveillance video from the liquor store, but did not locate any suspects at that time. The following day, Officer Lee saw Hill on a street two blocks from the store and recognized him from the surveillance video. After Jackson positively identified Hill as one of the assailants, Hill was placed under arrest.

### 2. Video Evidence

At trial, the jury was shown the surveillance video of the assault. The video shows the area in front of the liquor store from two different angles. In the video, Jackson parks his car along a sidewalk directly in front of the store. He gets out of his car and speaks to a group of people standing outside, including a woman in orange who was identified at trial as Jolene Hall. As Jackson is talking to the group, Hill rides up on a bicycle, parks it near the store entrance, and walks inside. While Jackson and Hill are inside the store, a group of three people congregate in front of the store and appear to be waiting for someone to come outside. The group consists of Jolene Hall, a Hispanic man in a dark shirt and dark pants, and an African-American man in a white shirt and dark pants. A few minutes later, Hill walks out of the store followed by Jackson.

As Jackson is walking toward his car, the Hispanic man in a dark shirt and dark pants approaches Jackson and punches him once in the left side of his face, knocking Jackson to the ground. The Hispanic man then gets on top of Jackson and continues hitting him. Within a few seconds, Hill joins the assault. Hill initially bends over Jackson's legs and appears to rifle through his pockets. With the Hispanic man still on top of Jackson, Hill moves toward Jackson's head area and continues bending over him. The Hispanic man and Hill begin dragging Jackson on the ground as a third man, the African-American man in a white shirt and dark pants, joins the assault. All three men struggle with Jackson on the ground while Jolene Hill walks around the group, appearing to encourage the assault. As Hill is bent over Jackson's head, Hill appears to apply direct physical force to Jackson's head or upper body while trying to restrain him. Hill abruptly stands up, walks away from the group, and mounts his bicycle. The African-American man kicks Jackson twice in his face, and then walks over to Hill and appears to hand an item to him. Hill rides away on his bicycle while Jolene Hall and the two other men flee on foot in the same direction. Jackson is left lying face down on the ground.

### B. Defense Evidence

Hill testified on his own behalf. On the afternoon of August 23, 2013, Hill rode his bicycle to Joo's Market. When he arrived, Hill saw Jackson talking to a group of people outside the store. Hill knew two men in the group from the neighborhood. He also knew a woman in the group, Jolene Hall, who appeared to be upset by something Jackson had said to her. Hill did not know Jackson and had never seen him before. Once inside the store, Hill had a brief conversation with Jackson. They then walked out of the store together where the group of people was waiting outside. One of the men in the group said something to Jackson and socked him. That same man and another man then began beating Jackson. Hill was shocked by the assault and dropped a small bag of crack cocaine that he had been carrying in his hand. Hill initially thought about trying to help Jackson, but decided he did not want to get involved. He did, however, want to retrieve his bag, which had fallen on the ground and was underneath Jackson. Hill reached under Jackson to get his bag, but did not reach into Jackson's pockets. He then left on his bicycle. Hill denied assaulting Jackson or robbing him during the incident. Hill admitted that he had two prior felony convictions for commercial burglary and one prior felony conviction for making criminal threats.

## III. The Jury Verdict

The jury found Hill guilty as charged of second degree robbery (§ 211) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)). The jury also found the allegations that Hill personally inflicted great bodily injury on Jackson during the commission of each crime to be true (§ 12022.7, subd. (a)). Following the sentencing hearing, Hill filed a timely notice of appeal from his judgment of conviction.

## DISCUSSION

### I.    The *Batson/Wheeler* Motion

On appeal, Hill first challenges the trial court's denial of his *Batson/Wheeler* motion. Hill, who is African-American, contends that the prosecution violated his federal and state constitutional rights to equal protection and a jury drawn from a representative cross-section of the community by exercising one of its peremptory challenges to excuse an African-American prospective juror. We conclude that this claim lacks merit.

### A.    Relevant Proceedings

At the start of jury selection in Hill's trial, a panel of 20 prospective jurors was seated in the jury box for voir dire. Prospective Juror No. 12 (Juror Identification No. 8692) on the panel was an African-American female. She described herself as IT manager for a packaging company. She was single, did not have any children, and did not live with anyone else who was employed. She had served on three prior juries. In two of the cases—a criminal trial involving second degree murder and a civil trial involving personal injury—the jury reached a verdict. The third case—a criminal trial involving domestic abuse—resulted in a hung jury.

In response to the trial court's question about whether any panel member had been a victim of a crime, Prospective Juror No. 12 reported that her car had been vandalized 15 years earlier and that the police were unable to find the perpetrator, but she thought that "they did what they could." Prospective Juror No. 12 did not respond when the panel was asked as a whole whether any of them had any relatives or friends in law enforcement, or any relatives or friends who had been arrested for, charged with, or convicted of a crime. During voir dire by the parties, the prosecutor asked Prospective Juror No. 12 and another juror the following hypothetical: "[T]he court tells you the laws. Speed limit is 65 miles per hour. You believe it should be 95. Evidence showed that the defendant was going 75. Can you apply the laws as the court instructs?" Prospective Juror No. 12 answered, "Yes." The prosecutor did not ask Prospective Juror No. 12 any other questions during voir dire.

Of the panel of 20 prospective jurors, three were excused for cause. In the first round of peremptory challenges, each side excused a juror. In the second round, the prosecutor accepted the panel with Prospective Juror No. 12 among the potentially empaneled jurors, and defense counsel exercised his second peremptory challenge. In the third round, the prosecutor again accepted the panel with Prospective Juror No. 12 included as a member of the jury, and defense counsel exercised his third peremptory challenge. In the fourth round, the prosecutor exercised her second peremptory challenge to excuse Prospective Juror No. 12. Defense counsel then immediately made a *Batson/Wheeler* motion, challenging the prosecutor's use of a peremptory challenge to remove Prospective Juror No. 12.

At sidebar, defense counsel explained the basis for his motion: "The People have exercised two peremptories at this point. However, . . . I've looked at the panel at large, and . . . I believe that there's only two African-American American jurors, . . . not just the panel that we have in front of us, but I think that includes the individuals in the audience." The trial court noted that the basis for a *Batson/Wheeler* motion was not the racial makeup of the panel as a whole, but "whether there's a valid or invalid reason for rejecting one of a particular class." Defense counsel responded that he believed he could make a prima facie showing of discrimination "based on percentages," and that in this case, "we have the People excluding 50 percent of the potential African-American American jurors." Defense counsel also stated that his prima facie case was based on the fact that "half [of] the People's peremptories have been at this point against . . . African-American Americans." With respect to the challenge used to excuse Prospective Juror No. 12, defense counsel asserted: "I didn't see the grounds, but I feel like that's skipping a step. I feel like the prima facie case is really about percentages and I think that's what the first step is."

In response, the trial court stated: "Well, at this point I don't find a prima facie case. I believe there's one very obvious reason why a prosecutor might want to excuse this juror. I know in my notes on this jury, however, in the event that I am found to be wrong on appeal if there is a verdict in this case and if there is a prima facie case, do you

7

want to justify it at this point, Miss Moore?"  The prosecutor replied:  "Well, your honor, I would agree . . . first of all, that the opposing counsel has not laid a prima facie case." The trial court interjected:  "No.  I'm making that ruling.  At the same time I see it . . . as a glaring reason why you might want to exercise a peremptory, but in the event that the court of appeal, if there is a conviction, were to find me incorrect, prima facie case, I've given you an opportunity right now to give me your reason."

The prosecutor then responded:  "I believe this juror, if I recall correctly, she had some contact or relative in contact that was in prison.  I also found her to be – somewhat appeared to me sometimes a little distracted.  I did accept the panel and had no problem with the makeup of the panel prior to other jurors being excused and just chose to invoke my peremptory at that point."  After noting that Prospective Juror No. 12 "was on a hung jury before," the trial court asked the prosecutor, "Did that cause you any concerns?" The prosecutor replied:  "It did, but the fact that she appeared more so to me distracted and that did cause me some concern, your honor, more than anything.  She just didn't seem to be paying, as when I noticed, . . . much attention."  Defense counsel pointed out that Prospective Juror No. 12 had not responded to the court's question on whether she knew anyone who had been charged with a crime.  The prosecutor acknowledged that she was "working off of memory" and did not have her notes from the first day of voir dire.

After confirming that the parties had no further argument on the matter, trial court stated:  "[The] court is going to deny the *Wheeler* issue at this point.  The court finds that there's race neutral reasons for prosecutor's exercise of a peremptory.  I also note, as I indicated, [it] seemed to me there was a basis for a prosecutor right out front that would be the hung jury issue which to me indicates that there was no prima facie case.  At least at this point it's only the second peremptory the People have exercised, and [the prosecutor] did pass twice with this juror indicating her willingness to accept the jury at least at some point with this juror.  So the *Wheeler* [motion] will be denied."

8

## B.    Applicable Law

"Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias.  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)"  (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).)  "When a defendant asserts at trial that the prosecution's use of peremptory strikes violates the federal Constitution, the following procedures and standards apply.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination."  [Citation.]'  [Citations.]  The identical three-step procedure applies when the challenge is brought under the California Constitution.  [Citation.]"  (*People v. Cowan* (2010) 50 Cal.4th 401, 447.)

"A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts gives '"rise to an inference of discriminatory purpose."'  [Citation.]"  (*People v. Thomas* (2014) 53 Cal.4th 771, 793-794.)  Among the "types of evidence [that] may prove particularly relevant" in evaluating whether a prima facie case of discrimination exists "are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong.  [Citation.]  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias.  [Citations.]"  (*Scott*, *supra*, 61 Cal.4th at p. 384.)  Where "'a trial court denie[s] a [*Batson/Wheeler*] motion because it finds no prima facie case of group bias was established, the reviewing court

9

considers the entire record of voir dire. [Citation.] "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm.'" [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 439.)

Once a defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to provide a non-discriminatory reason for exercising the peremptory challenge. The prosecutor "'need only offer a genuine, reasonably specific, race-or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice. [Citation.]'" (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75.) "'"We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citations.]'" (*People v. Lenix* (2008) 44 Cal.4th 602, 613-614, fn. omitted.)

## C.     The Trial Court Did Not Err in Denying the *Batson/Wheeler* Motion

Hill argues that the trial court erred in denying his *Batson/Wheeler* motion because the totality of the record established that the prosecution acted with a discriminatory purpose in exercising its peremptory challenges. He specifically asserts that the evidence was sufficient to support an inference of race discrimination in the prosecutor's use of a peremptory challenge to excuse Prospective Juror No. 12. He also claims that the prosecutor's proffered reasons for excusing Prospective Juror No. 12 were facially invalid, and thus, a pretext for impermissible race discrimination. We conclude that the trial court properly denied the *Batson/Wheeler* motion because Hill failed to demonstrate a prima face case of discrimination in the prosecutor's decision to peremptorily excuse Prospective Juror No. 12.

As a preliminary matter, we address Hill's argument regarding the proper standard of review. We ordinarily review the trial court's denial of a *Batson/Wheeler* motion "deferentially, considering only whether substantial evidence supports its conclusions." (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.) However, in cases where it is unclear whether the trial court applied the correct standard in finding that the defendant failed to state a prima face case of discrimination, "'we review the record independently'" to determine "'"whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.'" (*Ibid*.; see also *People v. Howard* (2008) 42 Cal.4th 1000, 1017 ["[w]here . . . it is not clear whether the trial court used the reasonable inference standard, . . . we review the record independently"].) Hill asserts that independent review is required in this case because the trial court applied an inappropriately rigorous standard by finding that Hill could not state a prima face case of discrimination unless he could show there was "no valid reason for excusing" Prospective Juror No. 12. This misconstrues the record. The trial court's reference to the validity of reasons for excusing a juror was made during an exchange with defense counsel about whether a prima facie case could be established by showing that the only African-American on a jury panel had been excused. In response to defense counsel's statement that a *Batson/Wheeler* motion could "be based on a single peremptory," the trial court noted that, in such a case, "typically . . . there's no valid reason for excusing that person." Contrary to Hill's claim, the trial court never suggested that Hill had to prove there was no valid reason for excusing Prospective Juror No. 12 to make a prima facie showing of discrimination, or that the reasonable inference standard did not apply. The trial court's ruling is therefore subject to the substantial evidence standard of review. In any event, even under an independent review of the record, we conclude that the trial court correctly determined that Hill failed to state a prima facie case of discrimination.

In making the *Batson/Wheeler* motion, Hill's counsel argued to the trial court that he had established a prima face case simply by showing that the prosecutor had excused one of two African-American prospective jurors in the venire. Hill's counsel explained that, at the time of the motion, the prosecutor had "exclud[ed] 50 percent of

11

the potential African-American American jurors" in the venire, and had exercised "half [of] the People's peremptories" to strike one African-American juror. Hill's counsel asserted that he could state a prima facie case "based on [the] percentages" alone. It is true that "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386.) However, the prima face showing is not made merely by establishing that an excluded juror was a member of a cognizable group. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 343; *People v. Bell* (2007) 40 Cal.4th 582, 598.) Rather, "in drawing an inference of discrimination from the fact one party has excused 'most or all' members of a cognizable group [citation], a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges." (*People v. Bell*, *supra,* at p. 598, fn. 3.) "Such a pattern will be difficult to discern when the number of challenges is extremely small." (*People v. Bonilla*, *supra*, at p. 343, fn. 12.)

In *People v. Bonilla*, for instance, the prosecutor struck the only two African-Americans in a 78-person jury pool. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 342.) The California Supreme Court concluded that "'the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible.'" (*Id*. at p. 343.) As the Court explained, """the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion."' [Citations.]" (*Ibid*.; see also *People v. Garcia* (2011) 52 Cal.4th 706, 747 ["While no prospective juror may be struck on improper grounds, we have found it "'impossible,'" as a practical matter, to draw the requisite inference where only a few members of a cognizable group have been excused and no indelible pattern of discrimination appears."]; *People v. Howard*, *supra*, 42 Cal.4th at p. 1018, fn. 10 ["The challenge of one or two jurors, standing alone, can rarely suggest a pattern of impermissible exclusion."]; *People v. Bell*, *supra*, 40 Cal.4th at p. 598, fn. 3 ["Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult."].) In this case, the

12

prosecution's use of a single peremptory challenge to excuse one of only two African-Americans in the venire was insufficient, standing alone, to establish a prima facie case.

On appeal, Hill contends that his prima facie showing of discrimination was based on other relevant factors and not merely on the race of the challenged juror. In particular, Hill claims that a discriminatory intent could be inferred from the fact that the prosecutor failed to engage Prospective Juror No. 12 "in more than a desultory voir dire." However, as the Attorney General correctly points out, the record shows that the prosecutor engaged in relatively limited questioning of the entire panel of prospective jurors that was originally called for voir dire, and with few exceptions, she was met with one-word responses from the jurors that she questioned. Moreover, there is no requirement that a prosecutor ask a prospective juror a minimum number of questions before deciding whether to accept or excuse the juror. Nor is there any requirement that the prosecutor exercise a peremptory challenge solely on the basis of the verbal responses elicited in voir dire. As our Supreme Court has recognized, "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citation.]" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) Indeed, a peremptory challenge may be based on "no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias." (*People v. Williams* (1997) 16 Cal.4th 635, 664.)

Furthermore, in ruling that Hill had failed to make a prima facie showing of discrimination, the trial court expressly found that there was a non-discriminatory reason evident in the record for the prosecutor to excuse Prospective Juror No. 12. Specifically, the trial court found that Prospective Juror No. 12's prior jury service in a case that resulted in a hung jury was a "very obvious" race-neutral reason for excusing her. On appeal, Hill does not dispute that prior experience serving on a hung jury can be a legitimate, non-discriminatory explanation for a prosecutor's exercise of a peremptory challenge. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 78 ["circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral neutral

13

reason for exercising a strike"]; *People v. Farnam* (2002) 28 Cal.4th 107, 138 [juror's prior service on a hung jury "'constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict'"].) Instead, Hill asserts that Prospective Juror No. 12's prior service on a hung jury was not a relevant consideration in determining whether he stated a prima facie case because such justification was first proposed by the trial court rather than by the prosecutor. However, as our Supreme Court has explained, in evaluating whether a prima facie showing of discrimination has been made, a trial "court may . . . consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Scott*, *supra*, 61 Cal.4th at p. 384; see also *People v. Montes* (2014) 58 Cal.4th 809, 854 [rejecting argument that trial court improperly supplied its own reasons for excusing prospective juror in its first-stage ruling because court was allowed to consider "possible reasons for the peremptory challenges . . . as part of its ruling that a prima facie case had not been made").] Therefore, at the first stage of its *Batson/Wheeler* inquiry, the trial court properly considered Prospective Juror No. 12's experience serving on a hung jury as an objectively evident non-discriminatory reason for the prosecutor to excuse her.[2]

---

[2] After the trial court ruled that Hill had failed to establish a prima facie case, it invited the prosecutor to state her reasons for excusing Prospective Juror No. 12 on the record in the event that its first-stage ruling was found to be erroneous on appeal. When the prosecutor explained that she had excused Prospective Juror No. 12 based on the juror's distracted demeanor and alleged contact with a relative in prison, the trial court asked her whether the juror's prior experience on a hung jury "cause[d] [her] any concerns." The prosecutor responded that "it did," but that she was more concerned that Prospective Juror No. 12 appeared distracted during voir dire. At the second stage of the *Batson/Wheeler* inquiry, a trial court's inquiry should be "confined to the *prosecutor's* motive for exercising a peremptory challenge. The court is not permitted to substitute its conjecture or surmise for the actual reasons declared by the prosecutor." (*People v. Phillips* (2007) 147 Cal.App.4th 810, 818.) We need not decide, however, whether the trial court erred in raising Prospective Juror No. 12's prior jury service at the second stage of its *Batson/Wheeler* inquiry because the court properly concluded in its first-stage ruling that Hill had failed to state a prima facie case.

14

Other circumstances appearing in the record support the trial court's conclusion that Hill failed to make a prima facie showing of discrimination.  In particular, the record shows that the prosecutor twice accepted a panel that included Prospective Juror No. 12 as a member of the jury before excusing her.  (*People v. Clark* (2011) 52 Cal.4th 856, 906 ["there was no discernable pattern from which to infer discrimination" where "the prosecutor passed [two prospective jurors] during several rounds of peremptory challenges before finally excusing them"].)  In addition, both Hill and Jackson, the victim in this case, are African-American and in the same protected class as Prospective Juror No. 12.  (*People v. Cleveland* (2004) 32 Cal.4th 704, 733 [circumstance that both the defendants and victim were of the same race as the challenged jurors supported finding of no prima facie case of discrimination].)  The totality of circumstances dispels any inference of a discriminatory motive on the part of the prosecutor in electing to excuse Prospective Juror No. 12.

Hill argues that a discriminatory intent can be inferred because the only reasons offered by the prosecutor for excusing Prospective Juror No. 12 were facially invalid.  He notes that the prosecutor provided two justifications to the trial court for the peremptory challenge:  (1) the juror had a contact or relative in prison, and (2) the juror appeared to be distracted during voir dire.  Hill asserts that the first reason concerning a prior prison contact was contradicted by the record because Prospective Juror No. 12 did not respond to the court's question to the panel members about whether they knew anyone who had been arrested for, charged with, or convicted of, a crime.  He claims that the second reason regarding a distracted demeanor also was invalid on its face because Prospective Juror No. 12 had a high-level job, had prior jury experience, and provided concise, coherent answers to the court's questions.  Hill further contends that, if anything, Prospective Juror No. 12 demonstrated a bias in favor of the prosecution based on her prior experience as a victim of vandalism and car burglary.

As the California Supreme Court recognized in *Scott*, "[a] proffered justification that is facially discriminatory must be weighed with the totality of the relevant facts to determine whether they give rise to an inference of discriminatory purpose" as part of the

first stage of the *Batson/Wheeler* inquiry. (*Scott*, *supra*, 61 Cal.4th at p. 391.) The court also noted that a "facially discriminatory justification advanced by the prosecutor . . . would almost certainly raise an inference of discrimination and therefore trigger review of the next step of the *Batson/Wheeler* analysis." (*Id.* at p. 392.) In this case, however, neither of the justifications proffered by the prosecutor for excusing Prospective Juror No. 12 was discriminatory on its face, nor were they sufficient to support an inference of purposeful discrimination when considered with the totality of the relevant facts.

The primary reason articulated by the prosecutor for exercising the peremptory challenge was Prospective Juror No. 12's demeanor during voir dire. As the prosecutor explained, her decision to excuse Prospective Juror No. 12 was based "more than anything" on her concern that the juror "appeared . . . distracted" and "didn't seem to be . . . paying much attention." "It is well settled that '[p]eremptory challenges based on counsel's personal observations are not improper.' [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 917 [no *Wheeler* violation where party's stated reason for striking a prospective juror was that she was not paying attention to the proceedings and was not sufficiently involved in the selection process].) Indeed, "'race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention)'" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 614), and "'nothing in *Wheeler* disallows reliance on the prospective jurors' body language or manner of answering questions as a basis for rebutting a prima facie case' of exclusion for group bias." (*People v. Reynoso*, *supra*, at p. 917.) While Hill disputes that Prospective Juror No. 12 was distracted during voir dire given her coherent responses to the court's questions, "[a]ll that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Id.* at p. 924.) The prosecutor's main proffered reason for excusing Prospective Juror No. 12—her distracted demeanor—was non-discriminatory on its face.

The other reason advanced by the prosecutor for excusing the juror—a contact in prison—was not supported by the record. However, this proffered reason was also race-neutral on its face and may have been an honest mistake of fact by the prosecutor. The

16

record shows that a number of prospective jurors who were questioned at the same time as Prospective Juror No. 12 disclosed having a relative with a prior criminal conviction. When defense counsel pointed out that he recalled Prospective Juror No. 12 "not responding to the court's questions about whether she knew anyone that had been charged with a crime in the past," the prosecutor acknowledged she was "working off of memory" and did "not have [her] notes" from the prior day of voir dire. At that point, the prosecutor had already made clear that her main objection to Prospective Juror No. 12 was based on demeanor. As our Supreme Court has observed, "[t]he purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral. 'Faulty memory . . . that might engender a "mistake" of the type the prosecutor proffered to explain [a] peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias.' [Citation.] [An] 'isolated mistake or misstatement' [citation] does not alone compel the conclusion that this reason was not sincere." (*People v. Jones* (2011) 51 Cal.4th 346, 366.) When the totality of the relevant facts is considered, the prosecutor's misstatement that Prospective Juror No. 12 had a contact in prison did not give rise to an inference of discriminatory purpose.

Hill further contends that, because the trial court evaluated the prosecutor's stated reasons for excusing Prospective Juror No. 12, this court should disregard the trial court's first-stage ruling that Hill failed to state a prima facie case and instead direct our review to the third stage of the *Batson/Wheeler* inquiry. However, in the recent decision in *Scott*, the California Supreme Court rejected this argument and held that a trial court's evaluation of a prosecutor's proffered reasons for exercising a peremptory challenge did not moot a prior finding that no prima facie case of discrimination exists. (*Scott*, *supra*, 61 Cal.4th at pp. 391-392.) In reaching this holding, the Court set forth the following specific procedure for appellate review of a *Batson/Wheeler* motion: "[W]here (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court

17

determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling. [Citations.] If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved. If the appellate court disagrees, it can proceed directly to review of the third-stage ruling, aided by a full record of reasons and the trial court's evaluation of their plausibility." (*Id.* at p. 391, fn. omitted.)

In this case, after hearing the basis for Hill's *Batson/Wheeler* motion, the trial court expressly found that a prima facie case of discrimination did not exist. The court then asked the prosecutor if she wanted to state her reasons for excusing Prospective Juror No. 12 on the record "in the event that [the court is] found to be wrong on appeal." When the prosecutor replied that Hill had not set forth a prima face case, the court reiterated that it was "making that ruling," but it also was giving the prosecutor an opportunity to respond "in the event that the court of appeal . . . were to find [it] incorrect" in its first-stage ruling. For the reasons set forth above, we hold that the trial court properly determined that Hill failed to establish a prima facie case of discrimination in the prosecutor's exercise of a peremptory challenge to excuse Prospective Juror No. 12. This holding "is sufficient to resolve [Hill's] claim of *Batson/Wheeler* error."[3] (*Scott*, *supra*, 61 Cal.4th at p. 392.)

## II. The Personal Infliction of Great Bodily Injury Enhancement

Hill also challenges the sufficiency of the evidence supporting the jury's findings that he personally inflicted great bodily injury in violation of section 12022.7. Hill specifically contends that the evidence at trial established that his physical contact with Jackson was limited to Jackson's waist area, and thus, Hill could not have contributed to the serious eye injury that Jackson sustained. We conclude that the jury's true findings on the personal-infliction enhancements were supported by substantial evidence.

---

[3] In light of our holding, we need not consider whether the trial court properly determined in its third-stage ruling that the prosecutor's proffered reasons for excusing Prospective Juror No. 12 were genuine.

18

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 12022.7, subdivision (a), provides a three-year sentence enhancement for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony . . . ." A defendant "need not be the sole or definite cause of a specific injury" to support a finding that he or she personally inflicted great bodily injury on a victim. (*People v. Modiri* (2006) 39 Cal.4th 481, 486.) In cases where more than one person perpetrates an attack, "the evidence is often conflicting or unclear as to which assailant caused particular injuries in whole or part. Thus, . . . those who participate directly and substantially in a group beating should not be immune from a personal-infliction finding for the sole reason that the resulting confusion prevents a showing or determination of this kind." (*Id*. at pp. 496-497.) In the context of a group beating, a personal-infliction finding can be made "if [the] defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others." (*Id*. at p. 497.) Accordingly, where

19

there has been a group assault and it is not possible to determine precisely which person caused which injury, personal infliction of great bodily injury may be found "if the defendant personally 'appli[ed] unlawful physical force' to the victim," and the physical force used by the defendant was "sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants." (*Id*. at p. 494.)

Hill argues that the evidence was insufficient to support the personal-infliction enhancements because the great bodily injury suffered by Jackson in the assault was the injury to his left eye, which the surveillance video showed was inflicted by the two other assailants. Hill further asserts that the evidence conclusively established that his only contact with Jackson was at Jackson's waist area, and that he never punched or kicked Jackson during the assault. Hill's argument, however, is not supported by the record.

At trial, Jackson testified that, during the attack, all three assailants were "on top of [him] beating the crap out of [him]." Although Jackson could not identify which of his attackers inflicted which injury, he testified that he felt "all three" men hitting him in his face and stomach as he was "pleading for [his] life." The video evidence presented to the jury at trial was consistent with Jackson's testimony. The video showed that Jackson was brutally attacked by three men, including Hill, and that each of the men personally used physical force on Jackson during the group assault. It is true, as Hill asserts, that there were two significant blows to Jackson's face that were undisputedly inflicted by the other assailants: (1) the initial punch by the Hispanic man which knocked Jackson to the ground, and (2) the kick by the other African-American man at the end of the assault. Contrary to Hill's contention, however, the video does not demonstrate that his only physical contact with Jackson during the assault was near Jackson's waist area. Rather, the video shows Hill moving from Jackson's waist area to his head area as the attack progressed, and then struggling with Jackson on the ground while bending over his head. The video also shows Hill and the Hispanic man dragging Jackson on the ground and all three assailants trying to restrain him as they searched the contents of Jackson's pockets.

While the video does not clearly show whether Hill delivered any direct punches to Jackson's left eye during the assault, it confirms that Hill used his hands and arms to

20

apply physical force to Jackson in the vicinity of his head. In watching the video, the jury reasonably could have found that Hill's arm movements while he was bending over Jackson's head and struggling with him on the ground were consistent with Hill striking Jackson in the face or head, and thus, contributing to his severe eye injury. The totality of the evidence presented at trial therefore reasonably could support a finding that Hill personally used physical force on Jackson that, in combination with the force used by the other assailants, was sufficient to cause Jackson great bodily injury.

## DISPOSITION

The judgment is affirmed.


                                        ZELON, J.



We concur:



PERLUSS, P. J.



SEGAL, J.


21